Filed 3/13/19; Certified for Publication 4/11/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>KEVIN JEROME EASTER,<br><br>    Defendant and Appellant. | A148197<br><br>(Contra Costa County<br>Super. Ct. No. 5-140725-3) |

A March 2014 information charged defendant Kevin Easter with the August 2013 murder of his wife. In May, his attorney expressed a doubt about his competency to stand trial, and the criminal proceeding was suspended pending resolution of the competency issue. In July and August, defendant was evaluated by two medical professionals, one finding him competent to stand trial, the other finding him incompetent. In April 2015—eight months after the evaluations—a jury found defendant competent to stand trial, and the homicide case resumed. Six months later, on the eve of trial, defense counsel again expressed a doubt regarding defendant's present competency. Two different judges declined to reinstate competency proceedings, finding that defense counsel failed to present substantial evidence of a substantial change of circumstances or new evidence casting doubt on the prior competency finding. The criminal case proceeded, resulting in a jury verdict of guilty on the first degree murder charge with a personal use of a firearm enhancement, a bench finding of guilty on a felon in possession of a firearm charge, and a sentence of 65 years eight months to life in state prison.

1

Defendant contends the trial court erred in failing to reinstate competency proceedings because his counsel had presented substantial evidence that he was experiencing new and worsened symptoms constituting a substantial change of circumstances in his mental condition. He also alleges numerous evidentiary and instructional errors, as well as sentencing issues raised in supplemental filings with the court. We agree with defendant that the trial court erred in failing to reinstate competency proceedings, and thus reverse on that ground. As such, we do not reach his evidentiary, instruction, and sentencing claims.

## PROCEDURAL BACKGROUND

On the night of August 7, 2013, Janice Easter, defendant's wife of five years, was shot to death in the living room of the home she shared with defendant. Defendant was arrested shortly after the murder. A March 26, 2014 information charged him with murder with a firearm enhancement and felon in possession of a firearm, further alleging he had three prior serious felony convictions and three prior strikes.

As will be detailed at length below, in May 2014, defense counsel declared a doubt regarding defendant's competency to stand trial, and the criminal proceeding was suspended pending the outcome of a Penal Code section 1368 competency proceeding. In April 2015, a jury found defendant competent to stand trial, and the homicide case resumed.

In October 2015, after defense counsel twice unsuccessfully renewed the issue of defendant's competency, defendant was tried before a jury, which found him guilty of first degree murder and found true the personal use of a firearm allegation. Following a bench trial, the trial court found defendant guilty on the firearm possession charge and found true the prior serious felony conviction allegations.[1] He was sentenced to 65 years eight months to life in state prison.

---

[1] Per the prosecutor, because defendant had not waived a jury trial on the strike allegations and the jury had been discharged, those allegations were moot.

2

Defendant filed a timely appeal, asserting that the trial court erred in three particulars: (1) failing to reinstate competency proceedings; (2) allowing inadmissible evidence that undermined an inference that the crime was second degree, rather than first degree, murder; and (3) instructing the jury on flight and suppression of evidence.

On February 20, 2018, defendant filed a petition for writ of habeas corpus raising three ineffective assistance of counsel claims. Two claims pertain to his counsel's conduct with respect to the April 2015 competency proceeding, specifically that his counsel failed to: (1) obtain extensive medical records documenting his mental health problems and provide them to the medical professionals who evaluated him and/or introduce them at the competency trial, and (2) obtain independent counsel to represent him at the competency proceeding so defense counsel himself could testify at that proceeding. The third claim asserts that his trial counsel was ineffective for failing to explore with defendant his desire to enter a not guilty by reason of insanity plea.[2]

On October 23, 2018, defendant sought leave to file supplemental briefing, or alternatively summary remand for resentencing, based on the passage of Senate Bill No. 620 (2017–2018 Reg. Sess.), which, effective January 1, 2018, affords trial courts discretion to strike or dismiss a Penal Code section 12022.53 firearm enhancement. (Pen. Code §12022.53, subd. (h); Stats. 2017, ch. 682, § 2.) The Attorney General opposed defendant's request, prompting a reply from defendant in which he argued that remand was appropriate, and also added a new claim based on Assembly Bill No. 1810, which added provisions to the Penal Code that allow for discretionary diversion of persons with qualifying mental health disorders under certain circumstances. (Pen. Code § 1001.35– 1001.36; Stats. 2018, ch. 34, § 24, eff. June 27, 2018.)

---

[2] By separate order of today's date, we deny defendant's petition as moot.

## DISCUSSION

### 1. Background of the Competency Issue

#### A. Defense Counsel's Initial Declaration of Doubt

On May 22, 2014, pursuant to Penal Code section 1368, deputy public defender Michael Kelly declared a doubt about defendant's competency to stand trial, informing the court, "He's developed some Parkinson's-like symptoms because of, I think, the change in medication and accompanied—the symptoms are auditory hallucinations. . . . I don't feel that he's competent at this moment and I'm hoping we can have someone who has some experience in medications. I don't know if you have any psychiatrists on your list or not or if it's just psychologists. But if you do, I would prefer that." The trial court appointed Omri Berger, M.D. to evaluate defendant. In a report dated July 17, 2014, Dr. Berger opined that defendant was incompetent to stand trial.

At a July 29 hearing, the prosecutor, Colleen Gleason, expressed her disagreement with Dr. Berger's report, and the trial court appointed Jennifer Kirkland, Ph.D., to conduct a second evaluation of defendant. In her August 22 report, Dr. Kirkland concluded defendant was competent to stand trial.

#### B. Jury Trial on Defendant's Competency

On April 6, 2015—more than eight months after Drs. Berger and Kirkland evaluated him—the matter of defendant's competency came on for a jury trial before the Honorable Barry Baskin. The evidence consisted of testimony from Dr. Berger on behalf of the defense, and Dr. Kirkland and Contra Costa County Deputy Sheriff Joseph Smith on behalf of the prosecution. The testimony was as follows:

Dr. Berger is a physician board-certified in psychiatry and forensic psychiatry. His private practice focuses on forensic psychiatry, and he has conducted approximately 100 Penal Code section 1368 evaluations. He is also employed by the Department of Corrections and Rehabilitation, providing psychiatric treatment for inmates at San Quentin State Prison, and is on the clinical faculty at the University of California, San Francisco.

4

Prior to interviewing defendant, Dr. Berger reviewed police records in the present case and medical records for treatment defendant received in jail dating back to 2012. The records reflected a criminal history beginning in the 1980s, including convictions for robbery, assault with a firearm, and domestic violence. They also reflected a documented history of mental illness, with symptoms consistent with schizoaffective disorder as far back as defendant's childhood. Defendant had experienced psychotic symptoms such as hallucinations and disorganized behavior, and also had a history of depression with suicide attempts.

When conducting a Penal Code section 1368 evaluation, Dr. Berger typically contacts the defendant's attorney since one of the elements of competency is whether the defendant can rationally work with his or her attorney. Accordingly, Dr. Berger obtained information from Mr. Kelly regarding his experience with defendant. He did not contact Ms. Gleason because he has never received a response when he has contacted prosecutors in the past.

Dr. Berger interviewed defendant for one hour 50 minutes, during which time he had no significant difficulty communicating with him. Defendant was a reliable reporter in terms of providing general information about his symptoms and medications, although he was unable to recall certain specifics. Dr. Berger did not observe any shaking, fidgeting, or "physical acting out." If anything, defendant displayed "more slowing of motor activity which can sometimes be observed in some individuals with certain disorders such as depression or other psychotic disorders." His thought process was linear and coherent though somewhat impoverished, which describes someone who "doesn't seem to have much in the way of spontaneous thoughts . . . ." He did not exhibit gross cognitive impairment, or "impairments in thinking, in attention or memory . . . ."

Dr. Berger diagnosed defendant with schizoaffective disorder bipolar type and polysubstance dependence. Schizoaffective disorder is a combination of schizophrenia, in which a person can experience delusions and "thinking that's jumbled," and a mood disorder, in defendant's case bipolar disorder, which is characterized by fluctuations

5

between depression and hyperactivity. Polysubstance dependence occurs when an individual has used multiple types of illicit substances, leading to significant impairment.

Dr. Berger administered a Miller Forensic Assessment Test (MFAST) to assess whether defendant was malingering. A score of six or higher suggests malingering, although some individuals who score six or higher may not be malingering, while some who score below six may be malingering. Defendant received a score of five. Dr. Berger did not believe further testing was necessary because his observations of defendant, defendant's medical records, and defendant's description of his symptoms were all consistent with a schizoaffective disorder.

Dr. Berger confirmed that when he asked defendant who raised the competency issue, defendant said he had. Defendant also said that he told Mr. Kelly he wanted to plead not guilty by reason of insanity, but Mr. Kelly did not "want to go this route," which was why defendant did not trust him. When Dr. Berger asked defendant if he knew what evidence the police had against him, defendant said he did not, claiming he had not seen any police reports and despite that he had sat through a preliminary hearing. He also told Dr. Berger he could not read or write, which Dr. Berger agreed was an exaggeration because defendant's medical records contained requests for medical treatment defendant himself had written.

Dr. Berger believed that at the time he evaluated defendant, defendant was incompetent to stand trial. Mr. Kelly had told Dr. Berger that defendant was initially able to focus and assist in his defense, but in the two to three months preceding the evaluation had become more symptomatic, withdrawn, and internally preoccupied and was having difficulty communicating. Defendant had expressed to Dr. Berger paranoid beliefs that Mr. Kelly was working against him and described hearing voices reinforcing his belief that Mr. Kelly was not working in his best interests. Dr. Berger believed defendant was having difficulty "challenging those thoughts in order to be able to effectively work with his attorney." Defendant told Dr. Berger his counsel had only met with him one time, which seemed unlikely for an experienced defense attorney in a homicide case and was inconsistent with what Mr. Kelly had reported to Dr. Berger. Dr. Berger interpreted this

6

as a reflection of defendant's "distortions" and the paranoia he felt towards Mr. Kelly. Additionally, Dr. Berger attempted to explain various parts of the legal process, but defendant had difficulty understanding and retaining some of the information.

Dr. Berger acknowledged that at the time of the competency trial (which occurred approximately eight months after his evaluation of defendant), he did not know whether defendant was competent to stand trial and agreed he could have gotten better or worse since the time of his evaluation. According to Dr. Berger, the symptoms of defendant's disorder could wax and wane month to month, week to week, and even day to day. Because of this, it was possible defendant improved over the month between his and Dr. Kirkland's evaluations. And it was possible for an individual to be incompetent to stand trial but to be competent in another setting, such as functioning properly in jail and following instructions given to him by the jail staff.

Dr. Kirkland, who has a Ph.D. in psychology, has been a licensed psychologist for 16 years, and has done approximately 300 forensic evaluations, testified that she received a referral to evaluate defendant in August 2014. The minute order she received contained the charges against defendant and a release to obtain his health records from the jail. She had difficulty obtaining the records, however, so she interviewed defendant before receiving them. After the interview, she received several hundred pages of defendant's jail medical records and a probation report. She did not contact defense counsel because she was court-appointed and did her best to remain neutral. She agreed the critical issue in determining defendant's competency to stand trial is his or her ability to assist defense counsel in preparing the defense, but she nevertheless does not communicate with defense counsel for fear it might influence her report. She generally only contacts counsel for either side when she cannot obtain information from defendant or there are no medical records.

Dr. Kirkland interviewed defendant on August 20, 2014 for approximately one hour. She began by explaining she had been appointed by the court to find out how he was doing and that she was going to write a report for the court and the attorneys, and defendant appeared to understand what she was saying. Although visibly anxious, he

was able to answer her questions, providing information about his background, medical conditions, current symptoms, and medication history. He was also able to define certain legal terms. Dr. Kirkland asked defendant about the different plea options, and he responded, "[N]ot guilty, or guilty, or not guilty by reason of insanity." Defendant told her he wanted to plead not guilty by reason of insanity, but his attorney "wouldn't go for it . . . ."

When Dr. Kirkland asked defendant who the public defender was, defendant said the public defender was supposed to be on his side but was actually on the district attorney's side. He believed the district attorney and public defender were working together, but Dr. Kirkland did not believe that stemmed from paranoia. Dr. Kirkland asked defendant how he got along with his attorney, and defendant said he "never really talked to the guy. All he really . . . says is you got another court date. I know as much as I knew when I got arrested." Most of his communications were with Mr. Kelly's investigator. From other things defendant said, however, Dr. Kirkland believed he had more contact with Mr. Kelly than he suggested.

During the interview, Dr. Kirkland saw some instances of defendant embellishing his responses. He spent a lot of time talking about his symptoms of psychosis, although she never witnessed any symptoms other than anxiety. Defendant also told her he could not read or write, which was inaccurate, as his medical records contained approximately 34 handwritten requests for medical treatment.

Dr. Kirkland administered the MFAST, and this time defendant received a score of 11. Because he scored a five a month and a half earlier, she spent more time reviewing his medical records.

Dr. Kirkland concluded defendant had a mental disorder of a psychotic nature. While she had insufficient time with him to diagnose his precise disorder, his records reflected prior diagnoses of "psychotic disorder NOS," schizoaffective disorder, bipolar disorder, and schizophrenia. When she asked defendant how he was doing with his mental health symptoms, he responded, "As long as I take my medication, I'm cool. I still have my mood swings, but I take Depakote, Zyprexa, Abilify. So, I'm cool."

8

Dr. Kirkland ultimately concluded defendant was psychiatrically stable and competent to stand trial. He did not display any signs of active psychosis, was able to pay attention to what she was saying, engage appropriately, answer her questions without any real difficulty understanding her, and express himself. She felt like he could communicate and cooperate with his attorney, ask for clarification if he did not understand, advocate for himself, maintain his relationship with the investigator, and formulate strategies with respect to his defense.

Contra Costa County Deputy Sheriff Joseph Smith, who worked at the county jail where defendant was incarcerated, testified he first met defendant in October 2013, and from January through March 2014 worked in the module where defendant was housed. He did not have any negative interactions with defendant, who was able to carry on conversations with him, follow his orders, and request medical attention. At one point when defendant's cellmate was released, defendant requested of Deputy Smith that his new cellmate not be loud, obnoxious, or crazy.

At the conclusion of trial, the jury found defendant competent to stand trial.

## C. First Renewal of Concerns Regarding Defendant's Competency

On October 8, 2015, six months after the competency trial and five days before defendant's homicide trial was set to commence, the parties appeared before the Honorable Peter Berger. Mr. Kelly again expressed a doubt about defendant's competency, advising Judge Berger:

"I've noticed a significant deterioration in Mr. Easter's mental acuity over the last couple weeks. I would say three to four weeks in particular. The problems that I've noticed are difficulties with personal hygiene, which before now had not been a serious issue. Incomprehensible paranoid responses to certain questions is what the psychologist[s] sometimes refer to it as the word salad.

"He is, in my opinion—obviously, I'm not a psychologist—but what I've noticed is responding actively to external stimuli, that is to say, auditory hallucinations. This was a problem in the past, but it has become more acute.

9

"At this point, trying to speak with Mr. Easter alone in a room is like trying to speak with Mr. Easter with a third person in the room and was asking him asking [*sic*] at the same time that I'm asking him questions. At any rate, given the decompensation— and what I'm suggesting is decompensation—from the level of July of last year, I don't feel I can in good conscience go forward with the trial. In particular, Mr. Easter, because of the mental infirmity, is unable to assist me in his defense at trial and, frankly, is unable to testify on his own behalf at this point at least in a constructive manner."

Ms. Gleason, the prosecutor, objected, citing defendant's alleged tendency to malinger and desire to avoid trial. She argued that a subsequent competency hearing is required only when there has been a substantial change of circumstances or when new evidence casts serious doubt on the validity of the prior finding, a burden she contended Mr. Kelly had not met. Mr. Kelly responded that "he's worse and he can't help me."

Ms. Gleason asserted that these were the same concerns raised in the initial competency proceeding, but Mr. Kelly disagreed: "I am alleging new symptoms, particularly, the hygiene problem and the word 'salad.' Although auditory hallucinations were a problem in the past, I was still able to communicate with him. I'm saying at this point it's hit and miss. It's very difficult. And by hit and miss, I mean sometimes I can communicate with him, sometimes I can't, so that's worse. And I am suggesting a couple of new problems that either weren't in existence before or that I didn't notice before. So I believe it's incorrect to suggest that the issues that I brought up today have already been litigated." Mr. Kelly believed defendant's medications had been changed in recent months, which he suspected would explain what was going on, although he did not yet have the records.

Ms. Gleason pointed out that over the previous month, defendant had appeared in court and was able to respond to the judge, such as when asked if he waived time. Mr. Kelly countered that "I don't think saying 'yeah' when the judge asked if you waive time is particularly helpful. I mean, let's cut to the chase. The idea here is that we don't want defense attorneys declaring a doubt to avoid trial or to delay trial. All I can tell you is that I'm not doing that. There's been a substantial change. He's—I've got a stack of

records so it's not like suggesting he has psychological problems [is] something new. Prison and jail records go back to when he was in the system in juvenile status. So he's been on medication and under treatment for many, many, many years. I don't think it's difficult to understand that his condition goes up and down. Respond[s or] doesn't respond to medication. And as I say, I'm stating for the record as an officer of the court that there's been a substantial change in recent weeks and he's useless to me right now."

After an off-the-record discussion, Judge Berger transferred the matter to Judge Baskin since he had presided over the competency trial.

The following day, the parties appeared before Judge Baskin. After confirming the applicable law, Mr. Kelly described in detail his concerns about defendant's behavior:

"Since we were last in court, it's gotten much, much worse, or substantially worse I guess would be the proper term. I think *Kelly*[3] also allows for different symptoms. That is to say, although the term substantial is used, *Kelly* also talks about rather than a worsening of previously known conditions, the emergence or discovery of new conditions, when what I'm alleging is both.

"I have noticed a substantial worsening . . . . [¶] . . . [¶] So, what I'm suggesting is that I am seeing new symptoms. I'm seeing a serious decline in personal hygiene, which can be an indication of mental illness. And I believe in this case it is. [¶] I don't want to play amateur psychologist. I'm not offering a diagnosis. But it would seem to me that I've seen it as a symptom, for example, of depression and bipolar disorder, enough that it's alarming to me, at least.

"I also for the first time am seeing what psychologists describe as word salad, a mixture of appropriate and inappropriate logical and fanciful responses to questions. In other words, it's as if the answer however formulated in the individual's mind is on Scrabble tiles, it's tossed up and comes down however it comes down. If you have enough time and patience, you can sometimes figure out what's relevant, what is and what's responsive, and what is not.

---

[3] *People v. Kelly* (1992) 1 Cal.4th 495 (*Kelly*).

11

"I am not at that stage with Mr. Easter. I am unable, really, to get the gist of what he's telling me quite often. I also am noting, and this is a substantial difference from a previously existing condition, that I believe the psychologists who evaluated Mr. Easter more than a year ago, even though trial was in April, I remember one of the glaring weaknesses in my case, that the psychologist had last seen him in July of the previous year that is that responding to auditory hallucinations.

"I don't know if it's linked or how it's linked to what I described as word salad, but it's certainly worse. That is to say that it's clear on many occasions Mr. Easter, while he was trying to pay attention to what I'm saying, he's also trying to pay attention to what I would say is an imaginary person in the room, but at any rate, is some sort of stimuli in the room that I don't see.

"So, as I think we have auditory hallucinations that are substantially worse than they were when last examined, and I would also state for the record, if it's relevant, are worse than they were at the time of jury verdict in the previous trial.

"I have new symptoms which cause me concern, and I find as much as I would like Mr. Easter to testify in the coming trial, that's simply not possible given his condition at the moment in addition to that, because that's a rather higher standard. I think although that's a Constitutional right. So, it's an interesting question, but I would say he's unable to assist at that point because he can't really follow a logical conversation with me.

"So, the problem is I would say I've reviewed recent medical records from the jail. I've noticed some recent changes in medication. I don't know if it's significant or not. I can't point to anything with my lack of expertise that is the cause, if I'm not sure an expert can either, but I assume they can, but I would say that we're in a situation where I'm asking you to have a doctor look at him, and I'm relying simply on me."

Judge Baskin queried "how this hearing is supposed to look?": "[I]s Mr. Kelly supposed to take the stand to testify under oath? Is he supposed to bring an expert in to testify under oath? Or is it just going on offer of proof, like we're doing here?" Ms. Gleason opined that the court was not required to hold an evidentiary hearing but

12

merely "a hearing for the defense to present enough evidence as a threshold matter for the Court [to] determine whether or not there's been a substantial change . . . ." She then suggested that to make such a demonstration, "perhaps if the defense had had an expert go into the jail in the meantime and speak to Mr. Easter, the Court doesn't have that. If the defense had the medical records that he was able [*sic*: unable] to get yesterday to provide for us, we don't have that." As to what in fact was before the court, she argued that the only new issue was the hygiene concern:

"With respect to the word salad issue, I would note that Dr. Berger had originally put into his report that that was not necessarily the terminology that Mr. Kelly used, but that Mr. Kelly had been having difficulty communicating with Mr. Easter. That was a condition or one of the factors that Dr. Berger took into consideration.

"The speaking to voices, that was also something that Mr. Kelly had complained about to Dr. Berger, however, and that the defendant actually complained to both doctors, but neither doctor saw any signs of that occurring during their . . . evaluations of Mr. Easter. And that was something that was also brought up during the trial.

"So, I think that the one change really has been a personal hygiene issue that has deteriorated within the past month, and I do not believe that that . . . symptom is the substantial evidence that we're discussing.

"I would say that, you know, that the case law goes so far as to say more is required than just bizarre actions, or bizarre statements, or statements that defense counsel says that the defendant is incapable of cooperating in his defense. That there has to be something more. And I don't believe that your Honor has that at this point."

Mr. Kelly responded that the communication difficulties he experienced before had to do with defendant's attention span. The communication problem this time, however, had a "different origin." He elaborated:

"I think this is based on experience over the years as a lawyer, obviously, I don't have a psychology degree, I think has to do with Mr. Easter's diagnosed schizophrenia. . . . [¶] . . . [¶] Is it reasonable for me to suggest that in the more than year that has passed since he was last examined by doctors there may have been a worsening

13

of symptoms and there may be new symptoms? I think that is reasonable. Whether or not it's true, of course, is something to be determined. I do think it's unreasonable to say that I should [hire] an expert in order to ask the Court for an expert, which is essentially what I'm doing when I declare a doubt. [¶] My hope is that the Court will appoint an expert who can interpret these changes, first of all. Obviously, they'll investigate them and see whether they find these symptoms are present. I believe that they will, and they can interpret them and give us—"

Judge Baskin interrupted Mr. Kelly to ask, "Do I have the power to do that? I thought I only have the power to do that if . . . the Court adopts your invocation of [Penal Code section] 1368." Further dialogue ensued on that question, with Mr. Kelly observing, "[W]hat Miss Gleason is saying, in essence, I don't mean to make light of it, you need to get an expert to tell the Court that we need an expert. And that's—to me, that's nonsensical, I think."

Judge Baskin responded, "I think what I'm hearing Miss Gleason say is that you need an expert to say that these differences in the way you are experiencing the auditory hallucinations and the difference in the way you now are observing the personal hygiene, together with changes in the medication, amount to some change in his fundamental competence as previously opined by doctors. [¶] And I would say, you know, hypothetically if you had an expert here saying what I just said, I think Miss Gleason would have a tougher time then to say that is not the change in circumstances that puts in question the jury verdict."

While Mr. Kelly agreed, he reiterated that "it's unreasonable because of duplicative efforts and because of the expenses that are associated it with [*sic*]. There is a mechanism in place for me if I'm having serious problems and I would tell you from a lawyer's perspective, I am stating that there is a substantial change." Or as Mr. Kelly alternatively put it, "[E]ssentially I'm the expert telling you that from a lawyer's standpoint—and, you know, I've actually testified to this in other trials before. I mean, I think you would agree—everybody [would] agree both Miss Gleason and I have a lawyer's perspective on these issues. [¶] From a lawyer's perspective, I think also from

a legal perspective, what we've seen since the last time this gentleman was diagnosed is substantial change, that is to say, a worsening in addition to symptoms that were either unrecognized or not present."

Ms. Gleason clarified that she was not suggesting that in order to reinstate competency proceedings, defendant first had to be reevaluated by a medical expert. However, she submitted: "[I]f Mr. Kelly had a doctor's report that said that the defendant was incompetent, it wouldn't be this Court's role to the[n] review that doctor's report to see if you agreed with it. We would have to suspend proceedings and then proceed through the normal course of action, because that would, I think, admittedly be a significant change in circumstances such that the Court would necessarily have to suspend proceedings."

Judge Baskin then took a recess, after which he declined to reinstate competency proceedings, finding that Mr. Kelly's offer of proof did not establish a substantial change of circumstances or new evidence casting a serious doubt on the validity of the prior finding of competency.

### D. Second Renewed Concern Regarding Defendant's Competency

Six days later, at an October 15 pre-trial hearing before the Honorable Lewis Davis, the issue of defendant's competency once again surfaced, when Mr. Kelly advised Judge Davis that defendant had filed a *Marsden*[4] motion and "I've tried to discuss it with him and explain it to him and find that he just does not get it," and that "because of mental illness or cognitive difficulties, he is unable to understand the proceedings and participate in an effective defense."

Ms. Gleason informed Judge Davis that during a hearing on motions in limine, defendant was able to assist Mr. Kelly by pointing out that there had been a parole violation hearing.

In response to Judge Davis's question about what differed from what had been presented to Judge Baskin the previous week, Mr. Kelly responded: "The inability of

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

15

Mr. Easter to understand the bifurcation of a charge and the significance of a waiver of jury trial. My guess is that there's something going on with medication because two days ago he seemed okay to me. Yesterday there was real problems, clear to me he wasn't understanding me. But after further conversation with him, that problem seemed apparent. So that's why I am bringing it up again. . . . [¶] . . . And what's happened is we've come up upon a trial issue that Mr. Easter doesn't comprehend and can't enter a waiver."

Ms. Gleason reiterated her position that "those are the same types of issues, while not specific, that Judge Baskin was aware of and made a decision based upon and also that the jury had contemplated and made their decision on."

After further discussion, the matter was put over to the next day to allow for receipt of the transcript of the hearing before Judge Baskin.[5]

The following day, discussion regarding defendant's competency resumed. Judge Davis summarized the applicable legal authorities, including that pursuant to *People v. Jones* (1991) 53 Cal.3d 1115 (*Jones*), the trial court's personal observations may be relevant. He noted that during a hearing that week on a motion in limine, defendant had offered that there had been a parole violation hearing, a fact relevant to the motion. This was significant to the judge because in order to provide that information to Mr. Kelly, defendant must "have been understanding exactly what we were talking about in court, and second, understood the significance of there having been a hearing at which there might have been a tape recording that could be used to assist him in his defense. [¶] I don't think there is a better indicator of someone being able to follow the proceedings and assist his counsel, which he clearly was doing by providing that information to Mr. Kelly than what we have with what Mr. Easter provided to Mr. Kelly."

Judge Davis asked Mr. Kelly to confirm what he was claiming as the change in circumstances. Mr. Kelly stated he did not believe defendant was understanding him, which was a change from a few days earlier when defendant was understanding him "just

---

[5] Judge Davis was prohibited from communicating directly with Judge Baskin because defendant had filed a Penal Code section 170.6 challenge to Judge Baskin.

16

fine . . . ." He also pointed to a comment by defendant that " 'they're poking me with a hot iron,' " and he reiterated a concern that the changes in defendant's circumstances may be related to a change in his medications.

After further discussion of applicable cases, Judge Davis declined to reinstate competency proceedings:

"So in reading the transcript of the proceedings last week, the information about medication was presented. [¶] . . . [¶] What was not presented was the statement 'They are poking me with a hot iron,' and not presented was the difficulty that you described for us about you being able to follow what the defendant was saying, along with the portion of that that I mentioned where the defendant was following very closely and gave you information which you then provided to the Court, and that's on the record.

"So it seems to me that the legal question is do these two, or to be—well, Judge Baskin decided the issue with respect to medication change. But even if I include that in what's new, I don't believe I can make a finding that—under *Jones* that I am being presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of the April 2015 jury's finding of competence. [¶] . . . [¶] . . . So that will be my order. So I am not going to suspend criminal proceedings, and the trial will proceed for the moment, but there is a pending *Marsden* motion which I need to deal with now . . . ."

Judge Davis then held an in camera hearing on defendant's *Marsden* motion, which he denied. Once back in open court, he stated for the record: "I understood everything Mr. Easter said. He followed everything very closely and understood, from what his responses were, and was listening to what I said and listening to what he said. So today at least, I find complete tracking of everything that is going on. So I hope that continues."

## 2. Judge Baskin Erred in Refusing to Reinstate Competency Proceedings

In *Jones, supra,* 53 Cal.3d 1115, the California Supreme Court summarized the applicable law, which is not in dispute: "A defendant who, as a result of mental disorder

17

or developmental disability, is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner,' is incompetent to stand trial. ([Pen. Code,] § 1367.) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. . . . [¶] When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*Id.* at pp. 1152–1153; accord, *People v. Rodas* (2018) 6 Cal.5th 219, 230–231 (*Rodas*); *Kelly, supra,* 1 Cal.4th at pp. 542–543, quoting *Jones*.) The evidentiary standard by which the trial court evaluates defense counsel's showing is substantial evidence: if counsel presents substantial evidence demonstrating a substantial change of circumstances or new evidence giving rise to a serious doubt about the validity of the original competency finding, the trial court must suspend the criminal proceeding and reinstate competency proceedings. (*Rodas, supra,* 6 Cal.5th at p. 231; *People v. Rogers* (2006) 39 Cal.4th 826, 846; *People v. Weaver* (2001) 26 Cal.4th 876, 954; *People v. Medina* (1995) 11 Cal.4th 694, 734; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 376, 384.)

We review for substantial evidence the trial court's finding of no substantial change of circumstances or no new evidence casting serious doubt on the initial competency determination (*People v. Huggins* (2006) 38 Cal.4th 175, 220), and we review its decision not to reinstate competency proceedings for an abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) Applying the foregoing standards here, we conclude Judge Baskin's finding that Mr. Kelly had not demonstrated a substantial change of circumstances in defendant's competency is unsupported by substantial evidence—and the decision not to reinstate competency proceedings was thus an abuse of discretion.

18

At the hearing before Judge Baskin, Mr. Kelly identified new symptoms defendant was experiencing and a worsening of pre-existing symptoms. As to new symptoms, he detected a "serious decline in [defendant's] personal hygiene." He also cited defendant's "word salad" communications, which he described as "a mixture of appropriate and inappropriate logical and fanciful responses to questions. In other words, it's as if the answer however formulated in the individual's mind is on Scrabble tiles, it's tossed up and comes down however it comes down." In addition to these two new symptoms, Mr. Kelly also described a "substantial" worsening of defendant's auditory hallucinations from when he was examined more than a year earlier. We need not address the hygiene and auditory hallucination issues because the new word salad symptom alone constituted a substantial change of circumstances that necessitated another competency proceeding.

Fundamental to the ability to assist counsel is defendant's mental capacity to "consult with his lawyer with a reasonable degree of rational understanding." (*Dusky v. United States* (1960) 362 U.S. 402.) And as the United States Supreme Court has observed, "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." (*Medina v. California* (1992) 505 U.S. 437, 450.) According to Mr. Kelly—who had represented defendant since his arrest shortly after his wife's murder—defendant's recent communications consisted of jumbled words and fanciful responses like Scrabble tiles tossed up and landing in random order. As a result, defendant could not hold a logical conversation, consult with Mr. Kelly with a rational degree of understanding, or assist in his own defense or testify at trial. This is precisely the deficient mental state Penal Code section 1367 is aimed at addressing. And the situation was different than anything described by Dr. Berger or Dr. Kirkland—and was not presented to the jury in April 2015.

The California Supreme Court's recent opinion in *Rodas, supra,* 6 Cal.5th 219, filed after oral argument in this case,[6] is instructive. In *Rodas*, defendant, who had a long history of mental illness, was found incompetent to stand trial on multiple murder and

_____

[6] We requested briefing on the significance of *Rodas*. Both parties submitted letter briefs as requested.

19

attempted murder charges. (*Id*. at p. 224.) He was subsequently restored to competence with the assistance of medication, and a medical report advised that he should remain on his medication regimen in order to maintain his competency. (*Id*. at pp. 225–226.) His case proceeded to trial, but before opening statements defense counsel advised the court that she had developed a doubt about defendant's present competence, describing statements he made that did not make sense, and speech that she described as a " 'word salad' . . . ." According to counsel, defendant was not taking his medication and she was having difficulty understanding him because she did not know "what he's saying" and "what he wants . . . ." (*Id.* at p. 227.)

The court then engaged in a colloquy with defendant, after which it told defense counsel it was " 'impressed with [the] clarity of [defendant's] speech and apparent clarity of reasoning in addressing the court. He understands the charges. He says he's willing to help you.' " The court asked defendant if he thought it was okay to proceed with the trial, and defendant responded affirmatively. After follow-up questions with defendant about his medication, the court told counsel they should move forward with the trial. (*Rodas, supra,* 6 Cal.5th at pp. 228–229.) The trial thus proceeded, with the jury ultimately finding defendant guilty of one murder charge with a special circumstance and two attempted murder charges. (*Id*. at p. 230.)

The Court of Appeal affirmed, rejecting defendant's argument that the trial court erred in failing to suspend proceedings when his counsel raised a doubt about his competence. In concluding that counsel's description of defendant's behavior " 'did not necessarily constitute substantial evidence of defendant's incompetence,' " the court relied heavily on defendant's responses to the trial court's questions, which it believed suggested competence: " '[Defendant] knew he was in a jury trial; he recited the charges against him with precision; he knew that [defense counsel] was defending him; he was willing to help her; he wanted to go forward with trial; and he apologized for his "obstructive" and "belligerent" behavior. The record therefore shows that [defendant] understood the nature of the criminal proceedings and could assist counsel in the conduct of a defense in a rational manner.' " (*Rodas, supra,* 6 Cal.5th at p. 230.)

20

The Supreme Court reversed, agreeing with defendant that the trial court erred in failing to suspend the criminal proceeding and initiate a formal competency inquiry. (*Rodas, supra,* 6 Cal.5th at p. 232.) In reaching this result, the court relied in part on *Pate v. Robinson* (1966) 383 U.S. 375, where, according to *Rodas*, "the high court made clear that when substantial evidence of incompetence otherwise exists, a competency hearing is required even though the defendant may display 'mental alertness and understanding' in his colloquies with the trial judge. [Citation.] The [*Pate*] court explained that while the defendant's in-court behavior 'might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue.' " (*Rodas*, at p. 234.) The *Rodas* court pointed out that it had followed the same principle in *People v. Lightsey* (2012) 54 Cal.4th 668, 703–704 and *People v. Pennington* (1967) 66 Cal.2d 508, 518, where it recognized that "[w]hen faced with conflicting evidence regarding competence, the trial court's role under Penal Code section 1368 is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing." (*Rodas*, at p. 234.)

The Supreme Court then turned to a discussion of *Jones, supra,* 53 Cal.3d 1115. It noted that in *Jones* it had stated that "the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state," particularly if the defendant has "actively participated in the trial" and the trial court has had the opportunity to observe and converse with the defendant. (*Jones*, at p. 1153; *Rodas, supra,* 6 Cal.5th at p. 234.) That said, it then went on to explain the limitations of what it would call "the *Jones* rule": "This rule does not . . . alter or displace the basic constitutional requirement of *Pate, supra,* 383 U.S. at pages 385 to 386, and *People v. Pennington, supra,* 66 Cal.2d at page 518, which require the court to suspend criminal proceedings and conduct a competence hearing upon receipt of substantial evidence of incompetence even if other information points toward competence. The effect of the *Jones* rule is simply to make clear that the duty to suspend is not triggered by information that substantially duplicates evidence already considered

21

at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Rodas*, at pp. 234–235.)

*Rodas* is significant for two fundamental reasons. First, the evidence of the new symptom there—defendant's "word salad"—was similar to the evidence of the new symptom here, and in both cases defense counsel informed the court that this change in defendant's mental state, likely linked to his medication, prevented counsel from understanding what defendant was attempting to communicate. That, according to the Supreme Court, was sufficient to mandate a renewed competency proceeding. (*Rodas, supra,* 6 Cal.5th at pp. 233, 235.) Second, *Rodas*'s explanation of "the *Jones* rule" makes clear that Judge Davis's later observations regarding defendant's mental state during a hearing on a motion in limine and a *Marsden* hearing could not obviate the necessity of a renewed competency hearing in the face of the evidence of new symptoms presented by Mr. Kelly to Judge Baskin.

The Attorney General's fundamental position here is essentially the same as Ms. Gleason's below. That is, the only new symptom was the hygiene issue, which was not a substantial change in circumstances and did not warrant a new hearing. Ms. Gleason claimed that the word salad symptom was not new because Dr. Berger had considered it, although he had expressed it in terms of defendant having "difficulty" communicating with Mr. Kelly. But defendant having difficulty communicating is a far cry from his thoughts coming out like "mixed up Scrabble tiles." And, Mr. Kelly explained, the communication difficulties were different: previously, the issues had to do with defendant's attention span, while this time the communication problem had a "different origin." While sometimes it was possible to "figure out what's relevant . . . and what is not," Mr. Kelly was generally unable to understand the gist of what defendant was trying to communicate. The record thus does not support the position that the "word salad" issue had been considered by Drs. Berger and Kirkland.

The Attorney General also argues that "while evidence of incompetence may emanate from demeanor or irrational behavior, 'bizarre actions or statements' by the defendant are not enough to raise a doubt of competency." This is indeed correct. (*People v. Marshall*, *supra,* 15 Cal.4th at p. 33; *People v. Danielson* (1992) 3 Cal.4th 691, 727.) But Mr. Kelly described more than bizarre actions or statements; he described an inability of defendant to engage in a logical conversation.

The Attorney General also suggests that the requisite showing could only be met with the opinion of a medical professional. For example, as to Mr. Kelly's representation that defendant's auditory hallucinations had worsened, the Attorney General says this: "Counsel's claim that appellant's auditory hallucinations had become substantially worse—absent the qualified opinion of a psychiatrist or psychologist that those symptoms left appellant incapable to understand the proceedings against him or incapable of assisting counsel—was insufficient evidence of a substantial change of circumstances or new evidence casting serious doubt on the validity of the jury's competency verdict. Defense counsel's statements, without more, are insufficient to raise a doubt as to the defendant's competence." The only authority the Attorney General cites in claimed support of this assertion—*People v. Laudermilk* (1967) 67 Cal.2d 272, 285—is unpersuasive. First, *Laudermilk* involved an initial determination of competence and thus a completely different standard than here. Second, *Laudermilk* simply did not hold, as the Attorney General implies, that "Defense counsel's statements, without more, are insufficient to raise a doubt as to the defendant's competence." Third, the *Laudermilk* court recognized the importance of defense counsel's representations regarding defendant's mental state: "Although not evidence strictly speaking, we have also included within the scope of our scrutiny the statements of defense counsel already referred to. While we intimate no rule ascribing probative value to such statements in all instances, nevertheless in the present situation counsel was describing and representing to the court his own personal experiences with and observations of his client. We regard these statements of a responsible officer of the court as tantamount to sworn testimony."

(*Id.* at p. 286; accord, *Medina v. California, supra,* 505 U.S. at p. 450 [statements by counsel are relevant to issue of defendant's competency].)

Judge Baskin grappled with what form Mr. Kelly's showing had to take in order to warrant a second competency proceeding. As noted, he queried "how this hearing is supposed to look"—whether Mr. Kelly's representations were sufficient, whether he needed to testify under oath, whether he needed to present the opinion of a medical professional. While Ms. Gleason claimed she was not suggesting that "in order to reinstate [Penal Code section] 1368 proceedings, that a new expert . . . has to go into the jail and evaluate someone," she and Judge Baskin adhered to the notion that if Mr. Kelly had arranged for a medical professional to re-evaluate defendant and opine as to his mental state, that could have satisfied the standard for reinstituting competency proceedings. But no authority requires an expert opinion at this stage, and, as Mr. Kelly rightly put it, it would be nonsensical to require defense counsel "to get an expert to tell the Court that we need an expert." *Jones, supra,* 53 Cal.3d 1115, which the Attorney General submits supports Judge Baskin's ruling, touched on the issue of expert opinion at this stage, but nowhere did it suggest such evidence was required.

In *Jones, supra,* 53 Cal.3d 1115, after defendant had initially been found competent in an uncontested court trial, defense counsel again raised the issue of defendant's present competency, generally representing that he had been unable to assist in his defense and that a psychiatrist who was present would so testify. Without hearing from the psychiatrist, the trial court denied the request to reinstate competency proceedings. (*Id.* at pp. 1152–1153.)

The Supreme Court affirmed, concluding the trial court did not err when it denied defense counsel's request without hearing from the psychiatrist, because defense counsel's offer of proof provided no reason to believe the psychiatrist's testimony would demonstrate a substantial change of circumstances. (*Jones, supra,* 53 Cal.3d at p. 1154.) This was so because defense counsel offered only a general description of the psychiatrist's proposed testimony, making no attempt to detail how the testimony would show a change in circumstances or cast doubt on the previous finding of competence. In

24

the absence of a more specific offer of proof, the court could not assume that the psychiatrist's testimony would establish a need to conduct a new competency hearing. Moreover, defense counsel's offer of proof did not establish that the psychiatrist had " 'sufficient opportunity to examine' " defendant. (*Ibid.*) Significantly, nowhere in the court's discussion of the attorney's offer of proof or the psychiatrist's proffered testimony did it suggest that the opinion of a medical expert was mandatory at that stage. And *Rodas, supra,* 6 Cal.5th at pp. 233, 235 implicitly confirmed that an expert opinion was not necessary by recognizing that defense counsel's statements alone were sufficient to necessitate a renewed competency proceeding.

The circumstances of this case also distinguish it from other cases in which the appellate court found no error in the trial court refusing to reinstate competency proceedings. (See, e.g., *People v. Taylor* (2009) 47 Cal.4th 850, 864 [deficits in defendant's " 'common sense reasoning and abstract thinking abilities' " and his " 'disturbingly inept' " defense of himself during penalty phase did not cast serious doubt on the trial court's finding that he knew what he was charged with and the nature of the trial]; *People v. Huggins, supra,* 38 Cal.4th 175, 219–220 [psychiatrist conceded defendant satisfied the competency requirements in 1990 and testified that there had not been a substantial change in defendant's mental condition since then]; *People v. Marshall, supra,* 15 Cal.4th at p. 33 [statements that defendant made at trial were insufficient to compel trial court to sua sponte make a renewed inquiry regarding defendant's competency because "[m]ore is required than just bizarre actions or statements by the defendant to raise a doubt of competency"]; *Kelly, supra,* 1 Cal.4th 495, 543 [evidence defendant cited on appeal to show his incompetence during trial was the same defense counsel recited when they initially expressed doubts about defendant's competency]; *People v. Oglesby* (2008) 158 Cal.App.4th 818, 828 [nothing suggested defendant's organic brain impairment had worsened since a report found him competent three months earlier, and his guilty plea was due to dissatisfaction with his defense counsel rather than a lack of understanding regarding the proceeding].)

25

Unlike the above cases, Mr. Kelly provided unequivocal specifics about recent changes in defendant's mental health, changes that in Mr. Kelly's opinion as an experienced deputy public defender rendered defendant incapable of aiding in his defense. While the heightened "substantial change in circumstances" standard is necessary to ensure defendant is not seeking a perceived advantage by unnecessarily delaying trial, there is no indication that was occurring here. And Mr. Kelly's description of defendant's new "word salad" symptom—especially in the context of defendant's lengthy history of psychiatric issues, the amount of time that had passed since his initial evaluations, and an apparently recent change in his medications that could have accounted for his new psychiatric issues—warranted the suspension of the criminal proceedings and the appointment of a medical professional to evaluate defendant's competency.

As to the appropriate remedy, *Rodas, supra,* 6 Cal.5th 219 guides us on that issue as well. There, the Supreme Court discussed when, upon a finding of error for failure to hold a competency hearing, the matter can be remanded for a retrospective competency hearing. (*Id.* at pp. 238–241.) As the court explained, "[T]he critical question in determining whether a retrospective competency hearing is feasible is whether there is 'sufficient evidence to *reliably* determine the defendant's mental competence when tried earlier.' " (*Id.* at pp. 239–240.) And, given "the fluctuating nature of defendant's symptoms, the passage of time, and the lack of contemporaneous expert evaluations," the court concluded a retrospective hearing "would neither be fair nor produce a reliable result." (*Id.* at p. 240.) Likewise here, where the expert evaluations were performed in July and August 2014 and defense counsel renewed his doubt—and defendant was tried—13 months later. Under these circumstances, a retrospective competency hearing could not place defendant "in a position comparable to the one he would have been placed in prior to the original trial." (*People v. Ary* (2011) 51 Cal.4th 510, 520.)

## DISPOSITION

We reverse the judgment of conviction and remand the matter to the trial court for further proceedings consistent with this opinion.

26

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*People v. Easter* (A148197)

27

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KEVIN JEROME EASTER,<br><br>     Defendant and Appellant. | A148197<br><br>(Contra Costa County Super.<br> Ct. No. 051407253)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter filed on March 13, 2019, was not certified for publication in the Official Reports. For good cause, the request for publication by Defendant and Appellant is granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____ _____

Acting P.J.

1

| | |
|---|---|
| Trial Judge: | Hon. Lewis A. Davis |
| Trial Court: | Contra Costa County Superior Court |
| Attorneys for Appellant: | Peter F. Goldscheider, under appointment by the Court of Appeal, for Defendant and Appellant. |
| Attorneys for Respondent: | Xavier Becerra<br>Attorney General of California<br>Gerald A. Engler<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>René A. Chacon<br>Supervising Deputy Attorney General<br>Bruce Ortega<br>Deputy Attorney General |