Filed 2/11/21  P. v. McKenzie CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B296803 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA074641) |
| v. | |
| CHARLES DANIEL MCKENZIE, | **REDACTED** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed.

Jack T. Weedin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Nancy Lii Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Charles Daniel McKenzie of three counts of resisting an executive officer in the performance of his or her duty under Penal Code section 69.[1]  The jury found true that in the commission of counts 2 and 3, McKenzie personally used a deadly or dangerous weapon, specifically, a screwdriver, as set forth in section 12022, subdivision (b)(1).  The trial court sentenced him to three years in state prison.

McKenzie raises four challenges on appeal.  First, he argues the trial court erred in declining to declare a doubt concerning his competence to stand trial.  Second, he contends the trial court violated his right to due process by failing to instruct the jury that it should not speculate about his absence from the trial.  Third, McKenzie argues that insufficient evidence supports the determination that he personally used a dangerous or deadly weapon.  Finally, he asserts that the trial court erred in failing to modify the jury instructions to clarify that a screwdriver is not an inherently deadly or dangerous weapon.  Finding no merit to his claims, we affirm.

## FACTUAL BACKGROUND

On November 14, 2017, at approximately 3:00 p.m., Los Angeles County Sheriff's Deputy Brandon Vanarsdale responded to a call about a person who was not breathing in front of a McDonald's.  When Deputy Vanarsdale arrived, he observed a person, who appeared to be a transient, lying on the sidewalk with his head covered by clothing.  Deputy Vanarsdale asked the person whether he was "okay."  In response, McKenzie sprang to his feet and began to yell, "fuck you" and "go away."  McKenzie

---

[1] All unspecified statutory references are to the Penal Code.

2

exhibited several indicators that he might attack, including his stance, and his acts of shuffle-stepping towards the deputy and holding his hands above his hips. Afraid for his safety, Deputy Vanarsdale pulled out his taser and asked McKenzie to step back. McKenzie responded by gesturing with his middle finger on both hands and telling the deputy, "Fuck you. Put that away." Deputy Vanarsdale told McKenzie, "If you come at me, I'm [going to] tase you." McKenzie then ran out into the number two lane of a busy street with three lanes of traffic in each direction. Cars swerved to avoid hitting McKenzie, and Deputy Vanarsdale called for assistance.

Upon arriving separately at the scene, Deputy Michael Gelardo and Sargent Thomas Inocente blocked traffic with their squad cars. Each repeatedly asked McKenzie to get out of the street. McKenzie refused and yelled, "Fuck you. I don't have to listen." Sargent Inocente determined McKenzie should be detained for his safety and the safety of others, and asked McKenzie to place his hands behind his back. McKenzie "shuffl[ed] with his clothes," reached into his pocket with his right hand, and pulled out objects that he held in a fist.

Sargent Inocente observed three short, metal, grey spikes protruding from McKenzie's fist. Deputy Vanarsdale observed McKenzie with his right fist clenched in front of his belly and a shiny object protruding one to two inches out of his fist. Deputy Vanarsdale told McKenzie to put "it" down. McKenzie did not do so. Instead, he took one or two steps towards Sargent Inocente and Deputy Gelardo, who were about three to four steps away from him. Sargent Inocente ordered Deputy Vanarsdale to tase McKenzie, which Vanarsdale did. McKenzie fell to the ground. Three objects were recovered from the spot where McKenzie fell:

3

a four-inch flathead metal screwdriver; a pen cap; and a Batman toy.

Sargent Inocente reported that during the encounter, McKenzie had a "crazed look" on his face and his clothes were disheveled.

At trial, both Deputy Vanarsdale and Sargent Inocente testified that in their experience, being stabbed with an object like a screwdriver could cause profuse bleeding or traumatic injury.

## PROCEEDINGS RELATED TO COMPETENCE
## TO STAND TRIAL

### A.    Dr. George R. Elias Finds McKenzie Competent to Stand Trial

A few days after his arrest, on November 16, 2017, McKenzie's trial counsel raised a doubt as to McKenzie's mental competence to stand trial pursuant to section 1368.  The trial court transferred the matter to the mental health court, where forensic psychiatrist Dr. George R. Elias was appointed to evaluate McKenzie.[2]

[                          **REDACTED**                          ]

---

[2] The trial court sealed many documents relevant to the competency proceedings.  In accordance with the California Rules of Court, the sealed documents were filed under seal in this court. (Cal. Rules of Court, rule 8.46(b).)  We have filed both a redacted and a sealed opinion.  The redacted opinion is part of the public record and does not include information that is only contained in the sealed portion of the record.  Our unredacted, sealed opinion, is filed concurrently with the redacted opinion.

4

Dr. Elias submitted his report to the trial court on or about January 21, 2018. On January 25, 2018, the trial court found McKenzie competent to stand trial.

## B. Dr. Phani M. Tumu Finds McKenzie Competent to Stand Trial

On February 8, 2018, McKenzie's counsel again declared a doubt. The trial court appointed forensic psychiatrist Dr. Phani M. Tumu to evaluate McKenzie.

[ **REDACTED** ]

On April 2, 2018, the trial court found McKenzie mentally competent to stand trial. The matter was returned from the mental health court and criminal proceedings were reinstated.

## C. McKenzie's Pretrial Behavior in the Courtroom, April 26, 2018 through June 21, 2018

On April 26, 2018, McKenzie appeared at a preliminary hearing. The trial court observed McKenzie was "extremely disruptive and display[ed] inappropriate behavior while in the courtroom. (Yelling, cursing, resisting). [¶] . . . [¶] The court indicate[d] continued behavior such as what [McKenzie] display[ed] today will constitute him voluntarily absenting himself from future proceedings." Similarly, on May 24, 2018, McKenzie refused to come into the courtroom and could be heard yelling in the lock-up cell.

On June 19, 2018, the matter was transferred to Judge Daviann Mitchell for trial. On June 21, 2018, McKenzie was "disruptive by continually speaking over the court." Defense counsel raised a doubt as to McKenzie's mental competency. The court concurred and appointed Dr. Kory Knapke to evaluate McKenzie.

## D. Dr. Kory Knapke Finds McKenzie to Be Competent and Malingering

Dr. Knapke submitted a report to the trial court on July 11, 2018. In evaluating McKenzie's competence, Dr. Knapke relied on four prior section 1368 reports he had prepared relating to McKenzie, dated between December 2014 and December 2016; the reports by Dr. Elias and Dr. Tumu; the felony complaint; the incident reports; the probation officer's report; and his July 10, 2018, interview of McKenzie. Dr. Knapke concluded that McKenzie was competent to stand trial and was malingering.

[ **REDACTED** ]

On July 11, 2018, the trial court concluded McKenzie was mentally competent to stand trial within the meaning of section 1368.

## E. McKenzie's Pre-trial Behavior Following Dr. Knapke's Report

### 1. *September 18, 2018, through January 9, 2019*[3]

On September 18, 2018, a different deputy public defender appeared on behalf of McKenzie. As described below, over the course of the next four months, the defense declared a doubt as to McKenzie's competence twice. Relying on the opinions of the forensic psychiatrists who evaluated McKenzie as well as the

---

[3] During proceedings on August 8, 2018, September 4, 2018, September 5, 2018, September 18, 2019, and October 31, 2018, McKenzie screamed in the courtroom or in lockup. The trial court found McKenzie to have voluntarily absented himself from proceedings on these days. As the trial court observed in one instance, "This is a pattern of conduct . . . . [¶] He is capable of conducting himself just fine in other areas. And as soon as we bring him into the courtroom, he starts shouting."

trial court's own observations, the trial court declined to declare a doubt in each instance.

During proceedings on October 2, 2018, and November 14, 2018, McKenzie was disruptive in the courtroom and in lockup, yelling out of turn that he did not attack the police and needed his freedom. Defense counsel declared a doubt as to McKenzie's competence on each of those days, but acknowledged that because he was new to the matter, he did not know if McKenzie's behavior was different from that previously observed and evaluated. Nevertheless, defense counsel explained there was further deterioration in his communication with McKenzie.

On both occasions the court declined to declare a doubt concerning McKenzie's competence, relying on the psychiatrists' findings that McKenzie's actions were behavioral and not a result of mental illness, as well as the trial court's own observations that McKenzie seemed oriented to time and place and understood the charges.

On January 9, 2019, defense counsel advised the trial court that McKenzie did not want him as his attorney. The trial court directed the bailiff to explain to McKenzie that if he wanted to make such a request, he needed to come into the courtroom. McKenzie told the bailiff, " 'No. I already did that. That doesn't work.' " The trial court denied the *Marsden*[4] motion because there was no basis provided to support it.

---

[4] Under California law, a criminal defendant may make a motion for substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

2. *February 19, 2019*

On February 19, 2019, McKenzie was present in the courtroom and yelled about the events surrounding his arrest, including that he did not resist arrest. When the trial court stated it would speak with McKenzie's attorney, McKenzie replied, "I don't want him as my public defender. He is working with you to help keep me here and I have been here all this time. And I keep telling you and telling you . . . I did not attack the police officer." After McKenzie was removed from the courtroom, defense counsel explained that he had tried to communicate a three-year plea offer to McKenzie, which, following a counter-offer, might have become "in essence a time served offer," but that McKenzie would not provide a yes or no answer. Defense counsel renewed his concern that McKenzie was not competent to stand trial because he could not communicate with counsel and was acting against his own best interest.

The trial court disagreed that McKenzie's refusal to accept the plea offer constituted evidence that he was acting irrationally against his own interest. Further, the trial court observed that, "I think it is his personality getting in the way. . . . When he comes in, he seems very aware of where he is, who people are, and what their functions are. And he's just angry. . . . [¶] . . . [W]e have had two [*sic*] experts, both of whom are consistent and unanimous in their opinion that he is malingering." Accordingly, the trial court declined to declare a doubt.

## F. Dr. Jack Rothberg Determines McKenzie is Not Competent

The defense hired forensic psychiatrist Dr. Jack Rothberg to evaluate McKenzie's competence. Based on the information

8

available to him, Dr. Rothberg concluded McKenzie was not competent to stand trial.

[                    **REDACTED**                    ]

## G.     The Trial Court Declines to Declare a Doubt Based on Dr. Rothberg's Report

At a February 25, 2019, hearing, defense counsel submitted Dr. Rothberg's report.  He declared a doubt as to McKenzie's competence on the ground that he was "not able to cooperate" or have meaningful communications with counsel.

Based on the opinions of Drs. Elias, Tumu, and Knapke, and the trial court's own observations, the trial court responded that "[i]t's not that [McKenzie] is unable.  It's that he is unwilling.  We get these reports every time he is in the courthouse. . . .  He is just fine downstairs.  He is perfectly calm.  He can and does control himself.  It's the minute we bring him into court that he puts on this show."  Further, each time McKenzie yells in court, he is "incredibly coherent," expressing his innocence.  Thus, McKenzie "is oriented as to time and place.  He knows why he is here.  He knows who [defense counsel is].  He is upset about the charges.  He is disputing the charges."  Thus, the trial court found McKenzie's lack of cooperation was a personality issue, not a mental health issue, and further observed that Dr. Knapke found that McKenzie was malingering.

The trial court disagreed with the basis on which Dr. Rothberg determined McKenzie was incompetent.  In particular, the trial court found Dr. Rothberg's statement that the facts giving rise to McKenzie's arrest implied mental illness was conclusory.  Additionally, the trial court found it "instructive" that Dr. Knapke had a direct interaction with McKenzie, while Dr. Rothberg did not.

9

The trial court then attempted to speak to McKenzie in the courtroom. However, each time the court began to speak, McKenzie yelled. The trial court observed, "There would be a moment of silence and every time I would try to speak is when he would start back up again. It seemed to be a concerted effort on his part to interrupt me every time I tried to speak. There [were] periods of silence, no one was talking, and I would gauge it and start talking and he [would] yell again." As before, McKenzie yelled that he wanted his freedom, he did not attack anyone, and he did not resist arrest.

The trial court declined to declare a doubt, citing the proposition that "[w]hen a competency hearing has already been held and the defendant was found competent to stand trial, the trial court is not required to conduct a second competency hearing unless it is presented with a substantial change in circumstances or with new evidence that gives a rise to a serious doubt about the validity of the competency finding." (See *People v. Marshall* (1997) 15 Cal.4th 1, 33.)

## H.    Trial Proceedings

On February 28, 2019, the matter was transferred for a jury trial back to Judge Mitchell, before whom McKenzie had appeared on April 26, 2018, and June 19, 2018.

On March 4, 2019, the court conducted a hearing on a defense motion to continue the trial on the ground that McKenzie was not competent. McKenzie appeared in the courtroom and began to yell. The trial court observed, "It's clear to me from his conduct that he is totally aware of everything that is going on.

10

[¶] . . . [¶] As soon as I stop talking, he stops.[5] And the record will reflect that the court reporter is transcribing my statements and it appears at this point—and he is continuing to scream 'I did not attack nobody.' He is looking directly at me. It is clear to me from his conduct that he knows exactly what is going on. That he is making an effort to get excused from the courtroom." The record reflects that McKenzie yelled, "You are not fucking listening," in response to the trial court's statement.

Outside of McKenzie's presence, the trial court reviewed McKenzie's file relating to his competence, including the reports by Drs. Elias, Tumu, and Knapke. The court found that McKenzie's behavior was consistent with the observations of the three psychiatrists, who each found McKenzie competent; that nothing had changed; and that another court had reviewed and ruled on Dr. Rothberg's report. Concerning Dr. Rothberg's report, the trial court discounted its credibility because Dr. Rothberg did not interview McKenzie or review the other doctors' reports. The court observed the content of McKenzie's rantings was rational and signified he understood the proceedings. The court concluded McKenzie had a behavioral problem, denied the motion to continue the trial, and declined to declare a doubt.

_____

[5] McKenzie behaved similarly on March 5, 2019. As observed by the trial court: "As evidenced by [McKenzie's] conduct, I waited approximately 60 to 90 seconds in silence, and he stayed silent looking at me, and as soon as I started to speak, he started to scream again. Again, that's evidence . . . consistent with [opinions of] the mental health professionals with his manipulation of the system and his effort to be removed from the courtroom, which he has now accomplished, because he's disrupting all the proceedings."

11

That afternoon, as jury selection commenced, the trial court advised the prospective jurors that, "as you can see, the defendant is not present in court. And I'm going to ask you to please take—and tell you please do not speculate as to why he is not here."

Trial resumed the next day, on March 5, 2019. Before the jury was brought in, McKenzie again engaged in disruptive behavior, and the trial court ordered him removed from the courtroom.

On March 6, 2019, McKenzie was again brought into courtroom and began to scream. After the trial court ordered McKenzie to stop screaming, he responded, " 'I don't have to do what you tell me to do.' " Later that day, the People concluded their case, and McKenzie was asked whether he wanted to testify. McKenzie did not yell at first, but gradually became louder as the conversation went on, stating that he did not assault the deputies. The trial court observed, "I do believe that he, at first, was speaking more in a rational manner initially when you tried to talk to him. I do believe he hears and understands what is said to him by the statements that he makes in court, and that he understood that he has a right to testify and has elected to act out and scream and yell as opposed to answer directly [the defense counsel's] questions." Defense counsel elected to not have McKenzie testify. McKenzie was never in the courtroom at the same time as the jury.

On March 7, 2019, the jury returned its verdict, convicting McKenzie of three counts of resisting an officer based on his actions toward Deputy Vanarsdale, Deputy Gelardo, and Sargent Inocente. As the trial court read the verdict to McKenzie, he screamed over the trial court each time the court spoke.

## I.    Sentencing Proceedings

Following the reading of the verdict, the trial court explained it would consider probation if there were a manner in which McKenzie could be safely monitored and receive mental health treatment.  The trial court observed, "I do think he has an issue.  Whether he's malingering is a totally different issue.  Whether he's manipulative is also a separate issue.  I think there's an underl[ying] mental health issue."  The trial court invited the parties to address the issue in their sentencing memoranda.

On March 19, 2019, defense counsel filed a motion for new trial, arguing, in part, that McKenzie was not competent at the time of trial.

On March 20, 2019, defense counsel advised the court that the jail's psychiatric social worker sought to place McKenzie under an Lanterman-Petris-Short (LPS) conservatorship because he was gravely disabled.  He provided the court with a letter from the sheriff's department, which noted that McKenzie " 'continue[d] to be uncooperative during his psychiatric assessments . . . isolates and has not participated for programming for about a month.  [¶]  Mr. McKenzie continues with poor insight and judgment due to his current mental health presentation and mental health history.  The client appears he may benefit from LPS evaluation due to the grave disability.' "  Accordingly, defense counsel again declared a doubt.

The trial court declined to initiate a competency hearing, observing that the letter was not from a psychiatric social worker.  It noted that being "gravely disabled" for purposes of a conservatorship is not the same as being incompetent.  The court stated, "I recognize he's noncompliant, and he has a personality

13

disorder which has been diagnosed [by] at least two mental health professionals, which makes him act out in the manner that he does, but it doesn't have to do with whether he understands the proceeding and what is going on here. It's how he responds to that information. So, I will not declare a doubt."

The sentencing hearing was conducted on March 26, 2019. A representative from the Department of Mental Health (DMH) appeared and advised the trial court that she had reviewed McKenzie's DMH records.

[                    **REDACTED**                    ]

Defense counsel revisited Dr. Rothberg's report. In response, the trial court observed it did not give weight to the report because defense counsel did not provide Dr. Rothberg "with all the information to make an informed decision," such as the DMH records or the report from Dr. Knapke. The court continued, "[N]ot to mention [Dr. Rothberg] has never even spoken with [McKenzie] . . . . That's one of the reasons I did not accept his report in the past."

Before bringing McKenzie into the courtroom, the trial court noted that for 45 minutes the court had not detected any sound coming from the location where McKenzie was waiting. A short time later, McKenzie was brought into the courtroom. He remained quiet, but as soon as the judge took the bench, he began to scream. The court noted that when it turned to discussing the evidence against McKenzie, McKenzie ceased his "mantra of 'you need to release me and stop abusing me,'" to state, "You are twisting the truth to what will help you and not me."

The trial court denied the motion for new trial and declined to find McKenzie incompetent. The court sentenced him to three years in state prison. McKenzie filed a timely notice of appeal.

14

## DISCUSSION

### A.    Competency Proceedings

McKenzie argues that on February 19, 2019, February 25, 2019, and during sentencing in March 2019, he presented the trial court with evidence upon which a doubt should have been declared as to his competence.  Throughout his briefs, McKenzie emphasizes that mental health can change over time and that the instances in which his trial counsel raised a doubt occurred several months after the last competency finding on July 11, 2018.  However, in each instance, McKenzie's behavior was the same as it had been at the time of the prior competency hearings.  As we explain, McKenzie failed to demonstrate a substantial change of circumstances or present competent, new evidence that cast a serious doubt on the validity of the prior competency findings.

#### 1.    *Legal Framework and Standard of Review*

A court may not try a defendant who, as a result of a mental disorder or developmental disability, "is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a); see U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15.)  When a trial court is presented with substantial evidence of a defendant's incompetence to stand trial, the court must initiate competency proceedings.  (§ 1368, subd. (a); *People v. Pennington* (1967) 66 Cal.2d 508, 518, discussing *Pate v. Robinson* (1966) 383 U.S. 375, 385-386 [86 S.Ct. 836, 15 L.Ed.2d 815].)  This is so "even if the court's own observations lead it to believe the defendant is competent."  (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)

15

"When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones*, *supra*, 53 Cal.3d at p. 1153.)  Further, "the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state." (*Ibid.*)

"Whether there has been a change in circumstances sufficient to call for a new competency hearing is necessarily a fact-specific inquiry." (*People v. Rodas* (2018) 6 Cal.5th 219, 235.) "We review for substantial evidence the trial court's finding of no substantial change of circumstances or no new evidence casting serious doubt on the initial competency determination [citation]." (*People v. Easter* (2019) 34 Cal.App.5th 226, 243.)  In this context, substantial evidence is that which " 'raises a reasonable or bona fide doubt' " as to competence.  (*Rodas, supra,* at p. 231.)

We review the trial court's "decision not to reinstate competency proceedings for an abuse of discretion.  [Citation.]" (*People v. Easter, supra*, 34 Cal.App.5th at p. 243.)

2. *The Trial Court Did Not Abuse Its Discretion in Declining to Declare a Doubt on February 19, 2019*

On February 19, 2019, McKenzie failed to engage with his counsel when asked whether he would accept or reject a plea offer.  McKenzie contends his behavior was against his own best interest, demonstrates incompetence, and should have caused the trial court to declare a doubt.  We disagree.

McKenzie's refusal to engage in meaningful dialogue, especially when such dialogue was likely to assist the trial court in moving forward in a timely and orderly manner, was not new. McKenzie exhibited the same behavior prior to the competency findings by Drs. Elias, Tumu, and Knapke.

[                    **REDACTED**                    ]

Further, the evidence is insufficient to demonstrate that McKenzie's refusal to discuss the plea offer was against his own best interest, or more importantly, so irrational as to indicate evidence of incompetence. Rather, his behavior was consistent with his repeated insistence that he was innocent.

[                    **REDACTED**                    ]

McKenzie's refusal to engage with his trial counsel also displays a rational tactic when considered in relation to his requests—including one made that same day—to be assigned a new public defender.

Indeed, the record contains several instances of McKenzie's rational attempts to manipulate people to achieve his goals.

[                    **REDACTED**                    ]

On January 9, 2019, when the trial court asked McKenzie to come into the courtroom to explain his reasons for wanting a new public defender, he told the bailiff that he "already did that," and "[t]hat doesn't work." When the trial court indicated it would speak with defense counsel, McKenzie responded, "I don't want him as my public defender." When the trial court chose to ignore him and noted that the court reporter would transcribe the court's statements, McKenzie screamed, "You are not fucking listening."

Rather than establish incompetence, McKenzie's refusal to engage with his public defender was consistent with a rational

17

choice and with his prior noncooperative behavior.  Substantial evidence supports the trial court's conclusion that the events on February 19, 2019, were insufficient to constitute a change of circumstances or new evidence casting serious doubt on the prior competency findings.  The court did not abuse its discretion in declining to initiate another competency hearing.

### 3. *The Trial Court Did Not Abuse Its Discretion in Declining to Declare a Doubt on February 25, 2019*

McKenzie next argues the trial court should have declared a doubt on February 25, 2019, based upon Dr. Rothberg's opinion that McKenzie was incompetent to stand trial.  However, Dr. Rothberg's report was insufficient to demonstrate a change of circumstances or new evidence casting serious doubt on the prior competency findings.  Thus, renewed competency proceedings were not required.

" ' "The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion." . . .  [Citation.]  In short, "Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions." . . .  [Citations.]' [Citation.]"  (*People v. Lawley* (2002) 27 Cal.4th 102, 132; see *People v. Pennington*, *supra*, 66 Cal.2d at p. 519 ["If a psychiatrist or qualified psychologist [citation], *who has had sufficient opportunity to examine the accused*, states under oath with particularity that in his professional opinion the accused is [incompetent to stand trial] . . . , the substantial-evidence test is satisfied."].)

18

Here, Dr. Rothberg's sources of information and reasoning were inadequate.  Dr. Rothberg did not interview McKenzie and did not review the section 1368 reports by the three other psychiatrists.

Rather, Dr. Rothberg based his opinion on a review of the jail's medical records.  While such a review certainly provided some value, the equivocal nature of many of the statements in Dr. Rothberg's report calls into question whether those records provided sufficient information.

[                    **REDACTED**                    ]

In declining to declare a doubt, the trial court also relied on its own observations that McKenzie was "incredibly coherent," and "is oriented as to time and place."  Relying on *People v. Pennington*, *supra*, 66 Cal.2d at p. 518, McKenzie argues the trial court must hold competency proceedings " '[n]o matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.' "  However, the prohibition against a trial court relying on its own observations applies to initial competency proceedings.  When a defendant has been found competent, the trial court may rely on its own observations in determining whether there has been a change in circumstances.  (*People v. Jones*, *supra*, 53 Cal.3d at p. 1153.)

Our high court's harmonization of *Pennington* and *Jones* in *People v. Rodas*, *supra*, 6 Cal.5th at p. 234, supports this result.  The *Rodas* court explained that *Jones* "does not . . . alter or displace the basic constitutional requirement of . . . [*Pennington*], which require[s] the court to suspend criminal proceedings and conduct a competence hearing upon receipt of substantial evidence of incompetence even if other information points toward

competence. The effect of the *Jones* rule is simply to make clear that the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*People v. Rodas, supra*, 6 Cal.5th at pp. 234-235.)

As described above, substantial evidence supports the trial court's finding that Dr. Rothberg's report was conclusory and insufficient to cast serious doubt on the prior three findings of competence. Coupled with the trial court's own observations of McKenzie's behavior, the trial court did not err in declining to declare a doubt based on Dr. Rothberg's report.

4. *The Trial Court Did Not Abuse Its Discretion in Declining to Declare a Doubt in March 2019*

McKenzie contends that during the sentencing phase, the trial court was presented with "new and substantial evidence" of McKenzie's incompetence "from [McKenzie's] trial counsel, from the [DMH] [representative], and [from McKenzie's] county jail medical records." In each instance, however, the evidence failed to meet the standard required for the initiation of renewed competency proceedings.

First, the trial court reviewed a letter from the sheriff's department indicating that an LPS conservatorship was being sought for McKenzie.[6] As the trial court correctly observed, the qualifications for an LPS conservatorship are not equivalent to

---

[6] A copy of this letter is not included in the appellate record.

20

those for incompetence under section 1368. Although an LPS conservatorship is available to those who are mentally incompetent to stand trial, other bases exist for such conservatorships. (See Welf. & Inst. Code, § 5008, subd. (h) [defining persons who are gravely disabled for purposes of an LPS conservatorship].) There was no evidence that a conservatorship was being explored for McKenzie on the ground that he was mentally incompetent as defined in the Penal Code, and counsel did not provide any further evidence or argument on this point in the trial court or on appeal.

Second, trial counsel advised the court on two occasions in March 2019 that McKenzie would not speak with him. As discussed above, however, such behavior was entirely consistent with the behavior McKenzie exhibited prior to the competency findings: a volitional decision to not cooperate.

Third, McKenzie argues the DMH representative provided evidence that compelled the trial court to declare a doubt. However, the contrary is true. The information disclosed by the DMH representative did not demonstrate that McKenzie was unable to understand the proceedings and could not assist defense counsel.[7]

Fourth, during the March 26, 2019, sentencing hearing, McKenzie presented the trial court with 200 pages of jail medical records for the trial court to review. On appeal, McKenzie argues that these "records are replete with evaluations from psychiatrists and psychologists that [he] suffers from schizophrenia."

[                    **REDACTED**                    ]

---

[7] [                    **REDACTED**                    ]

21

Moreover, a diagnosis of schizophrenia does not necessarily establish that a defendant is incompetent to stand trial. (See, e.g., *People v. Blacksher* (2011) 52 Cal.4th 769, 798 ["Although [the doctor] believed defendant suffered from paranoid schizophrenia, he concluded defendant remained 'sufficiently in contact with reality to be considered mentally competent to stand trial.' "]

We conclude there was insufficient evidence of either a change of circumstances or new information casting serious doubt on McKenzie's competence during the March 2019 proceedings. The trial court did not err in declining to initiate further proceedings under section 1368.

Review of the record in this case reflects a trial judge who remained calm and patient, and who deftly managed the proceedings under challenging circumstances with a defendant who was determined to disrupt the courtroom. We commend the trial court for its careful and diligent approach to documenting the record to enable meaningful appellate review.

## B.   Jury Instructions

McKenzie argues the trial court violated his due process rights when it declined to give an instruction that the jury should not speculate as to McKenzie's absence from the courtroom or consider that fact in their deliberations. This argument is based, in part, on the erroneous assertion that the trial court never addressed McKenzie's absence.

### 1.   *Factual Background*

The record demonstrates that during voir dire, with the agreement of defense counsel, the trial court advised the venire, "as you see, the defendant is not present in court. And I'm going

to ask you to please take—and tell you please do not speculate as to why he is not here."

On March 6, 2019, the trial court inquired whether counsel sought any changes in the jury instruction packet the trial court had prepared. Defense counsel responded, "I know we had discussed it, and I believe the court actually read an instruction in the beginning of the case regarding the fact that the defendant was not present and not to speculate on that." The trial court responded, "[T]here is no instruction that covers that. I just indicated that he's not here. That's it—at your request. They're not to speculate as to why he's not here. But there is no jury instruction that covers that. I just told them." Defense counsel did not pursue the matter further.

2.      *The Trial Court's Failure to Further Instruct the Jury About McKenzie's Absence Did Not Violate Due Process*

McKenzie does not provide any legal authority establishing that a trial court must instruct the jury about a defendant's absence prior to their deliberations. During the trial, he did not specifically request a pinpoint or special jury instruction on the topic, and the trial court does not have a sua sponte duty to provide such an instruction. (*People v. Sully* (1991) 53 Cal.3d 1195, 1241.) Contrary to McKenzie's suggestion, an instruction to disregard a defendant's absence is not equivalent to an instruction to disregard visible restraints. Unlike the inference that a shackled defendant is predisposed to commit violent crimes, there is "[n]o similar inference of prejudice" when a defendant voluntarily absents himself from the courtroom. (*Ibid*.)

23

Here, McKenzie was absent from the entire trial. The trial court directed the jury panel to not speculate about his absence or consider it in their deliberations. It also instructed the jury as to the presumption of innocence, the burden of proof, and the accused's right to not testify at trial. McKenzie does not show the trial court's failure to repeat the admonition about his absence prior to their deliberations violated his constitutional right to due process. (See *Henderson v. Kibbe* (1977) 431 U.S. 145, 155 [97 S.Ct. 1730, 52 L.Ed.2d 203] ["An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."]; *People v. Mills* (2012) 55 Cal.4th 663, 677 [the question is whether the omitted instruction " ' " 'so infected the entire trial that the resulting conviction violates due process' " ' "].)

## C.    Enhancement for Personal Use of a Weapon

In his final argument, McKenzie maintains the evidence was insufficient to support the jury's finding that he personally used a deadly or dangerous weapon, and the trial court erred in instructing the jury on this allegation.

### 1.    *Substantial Evidence Supports the Jury's Determination that McKenzie Personally Used a Deadly or Dangerous Weapon*

In considering a challenge to the sufficiency of the evidence, we " ' " ' review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' [Citation]" (*Ibid.*)

24

Pursuant to section 12022, subdivision (b)(1),[8] the prosecution alleged that in committing the offenses against Deputy Gelardo and Sergeant Inocente, McKenzie personally used a deadly or dangerous weapon. The trial court instructed the jury with CALCRIM No. 3145, which required the jury to determine if the People proved beyond a reasonable doubt that McKenzie "personally used a dangerous or deadly weapon." The instruction defined "deadly or dangerous weapon" as "any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury . . . . Someone personally uses a dangerous or deadly weapon if he or she intentionally . . . displays the weapon in a menacing manner." (See CALCRIM No. 3145.)

Instrumentalities "which may be used as weapons but which have nondangerous uses, such as hammers and pocket knives," may constitute deadly or dangerous weapons within the meaning of section 12022, subdivision (b)(1) when they are "capable of being used in a ' "dangerous or deadly" ' manner and the evidence shows its possessor intended to use it as such." (*People v. Burton* (2006) 143 Cal.App.4th 447, 457.)

Deputy Vanarsdale and Sergeant Inocente testified that McKenzie obtained something "metal," "shiny," and "spike[y]" from his clothing and held it in a fist so that the point or spike

---

[8] Section 12022, subdivision (b)(1) states, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

was visible.  Further, he did not have his arm resting downward, but rather had his arm bent so that his fist was before his stomach.  While brandishing this object, McKenzie moved toward Deputy Gelardo and Sergeant Inocente.  The object was later identified to be a screwdriver, and both officers testified it could have been used to cause profuse bleeding or traumatic injury.  This is sufficient evidence upon which a reasonable trier of fact could have found McKenzie personally used a dangerous or deadly weapon in committing the offenses against the officers.  (See *People v. Simons* (1996) 42 Cal.App.4th 1100, 1107 [concluding that a screwdriver qualified as a "deadly weapon" under § 417.8 when waved aggressively at officers to prevent arrest].)

2. *The Trial Court Did Not Commit Prejudicial Error in Failing to Modify CALCRIM No. 3145*

McKenzie asserts the trial court erred in failing to modify CALCRIM No. 3145 to clarify that a screwdriver is not an inherently deadly or dangerous weapon.

As discussed above, the trial court instructed the jury that a dangerous or deadly weapon is an object that either (1) is inherently deadly or dangerous, or (2) is used in such a way that it is capable of causing and likely to cause death or great bodily injury.  In *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), the California Supreme Court considered the alternate theories presented by section 12022, subdivision (b)(1) and CALCRIM No. 3145, and held that when an object is not inherently dangerous, it is error for the trial court to instruct the jury on both theories.  (*Aledamat*, *supra*, at p. 7.)  A screwdriver is not an "inherently" dangerous weapon.  (*People v. Simons, supra,* 42 Cal.App.4th at p. 1107; see also *Aledamat, supra,* at p. 6 [a box

26

cutter is not an inherently dangerous weapon].)  Therefore, under the holding in *Aledamat*, the trial court erred in failing to strike the first theory before presenting the instruction to the jury.**9**

*Aledamat* further holds that in evaluating the import of this error, we apply the harmless error test articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].  (*Aledamat, supra,* 8 Cal.5th at p. 13.)  Under this test, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Ibid.*)

As explained in *Aledamat*, the danger in providing an unmodified instruction is that the jury simply may find the object in question is inherently deadly without considering the surrounding circumstances, including how the defendant used it. (*Aledamat, supra*, 8 Cal.5th at pp. 13-14, 15.)  Here, it is unlikely the jury presumed the screwdriver was inherently deadly or dangerous.  It is common knowledge that a screwdriver is a tool used to turns screws and is not ordinarily used as a weapon.  (See *People v. Pruett* (1997) 57 Cal.App.4th 77, 86 [noting "[j]urors can

---

**9** It is arguable whether McKenzie waived this contention by failing to raise an objection in the trial court.  (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162, fn. 14 [a claim of instructional error is forfeited for failure to raise an objection at trial].)  Assuming, arguendo, that a waiver occurred, given that the decision in *Aledamat* was issued several months after McKenzie's trial, we exercise our discretion to consider this challenge on appeal.  (See *People v. Denard* (2015) 242 Cal.App.4th 1012, 1030, fn. 10 ["where an otherwise forfeited claim presents an important question of constitutional law or a substantial right, the appellate court may exercise discretion to review the claim"].)

certainly employ common sense and experience to determine whether or not" a knife is a deadly instrument].)

Moreover, neither the People nor defense counsel suggested that the screwdriver wielded by McKenzie was inherently deadly or dangerous. Both counsel focused the jury's attention on how the screwdriver was used. The prosecutor argued, "A screwdriver, it's not big. It's not like a long screwdriver. It's pretty thin. But it has a pointed end. And if used in a particular way, like the language [in the instruction] said used in such a way that is capable of causing or likely to cause great bodily injury, it can actually really harm someone. . . . And so, absolutely, the screwdriver that was found can cause great bodily injury. . . . [I]n deciding whether an object is a deadly weapon, you have to consider all the circumstances. . . . [I]n this particular case, [McKenzie] didn't have the screwdriver sitting on the street fiddling with his eyeglasses or watch." The prosecutor then described how McKenzie held the screwdriver and stepped toward the deputies, and urged the jury to "[l]ook for any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose."

Defense counsel explained the definition of a dangerous or deadly weapon under CALCRIM No. 3145 as follows: "So [you have] two classes of things. . . . Things that are inherently deadly or dangerous . . . . [W]hat are obvious examples? Well, a firearm . . . . A firearm is clearly inherently dangerous. . . . A razor-sharp samurai sword. Of course. It's inherently deadly and dangerous. [¶] But then we have everything else in the world. It's not a weapon. It's not something that is inherently deadly. Everyday objects, can they become dangerous or deadly if used in a certain way? Sure. Just about anything can become a

dangerous or deadly weapon if you use it in such a way as to be likely to cause death or great bodily injury, but they're not inherently dangerous or deadly by themselves." Referring to the screwdriver, defense counsel explained, "It's a tiny little screwdriver, for tiny little screws . . . . It's not inherently deadly or dangerous. . . . [¶] So how could these possibly become dangerous or deadly weapons? Only if they're used in such a way likely to cause serious bodily injury or death."

Based on the common understanding of the purpose of a screwdriver, and the argument by counsel, it is unlikely the jury found the enhancement to be true based solely on a finding that the screwdriver was inherently deadly or dangerous. Therefore, any error in failing to strike the additional language from the instruction was harmless beyond a reasonable doubt. (See *Aledamat*, *supra*, 8 Cal.5th at pp. 14-15 [holding the instructional error was harmless based on common knowledge about box cutters and the argument of counsel].)

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED

FEDERMAN, J.*

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.