Filed 6/16/22  P. v. Lewis CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>IZELL LEWIS,<br><br>        Defendant and Appellant. | A159741<br><br>(Marin County<br>Super. Ct. No. SC202156) |

Defendant Izell Lewis appeals after a jury found him guilty of rape.  On appeal, defendant argues the trial court erred by: (1) failing to hold a competency hearing under Penal Code section 1368[1] when his mental condition deteriorated after he stopped taking medication; (2) denying his motion to dismiss pursuant to *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Trombetta/Youngblood* motion); (3) admitting his pretrial police interview statements because he was not properly advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 476 (*Miranda*); and (4) excluding a defense expert from testifying.  He also contends he is entitled to resentencing due to recent amendments to section 1170.  The People concede the trial court erred in failing to hold a

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

competency hearing.  We agree and, on that ground, reverse the judgment and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The first suspension of proceedings

In September 2017, defendant was charged by complaint with one count of rape (§ 261, subd. (a)(2)).  He initially appeared represented by a private attorney, but by December 2017, he asked to be represented by the public defender or to represent himself.  The public defender accepted the appointment but by January 2018, defendant made a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)) for the appointment of substitute counsel.  The trial court denied the *Marsden* motion, but the public defender declared a conflict, and so did the attorney appointed thereafter.  Then in March, defendant again sought new counsel.  In April, he filed a *Faretta* motion (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)) to represent himself.  Defendant represented himself for about two weeks before requesting counsel.  Shortly after being appointed, defendant's fifth attorney declared a doubt as to defendant's competency.

Defense counsel indicated at a hearing that defendant had been erratic in making his *Marsden* and *Faretta* requests, and that three of defendant's prior attorneys had reported defendant's inability to rationally assist or cooperate during prior periods of representation.  Counsel stated that defendant's reason for requesting an attorney seemed irrational.  Moreover, he did not seem to understand the elements of his offense and possible defenses, and he was unable to cooperate or assist her in raising defenses.  Counsel noted defendant's desire to testify at his preliminary hearing, but said his reasons were "completely irrational."  She doubted he could knowingly and intelligently waive his Fifth Amendment rights.

2

The trial court suspended proceedings and defendant, while waiting for evaluations by doctors, continued to make *Marsden* and *Faretta* motions. Defense counsel also moved to withdraw, citing an "absolute, irretrievable breakdown in the attorney-client relationship." In July 2018, the court denied defendant's motion for new counsel and defense counsel's request to withdraw.

On August 8, 2018, defense counsel again moved to withdraw. After a closed hearing, the trial court granted that motion and appointed the sixth defense attorney in this case, who ultimately represented defendant through trial and sentencing. Before the end of August 2018, defendant started refusing to attend hearings and again sought new counsel. On August 31, 2018, after considering Dr. Catherine Main's report concluding that defendant was competent, and psychiatrist Dr. Zachary Torry's report which was inconclusive as to defendant's competency,[2] the court found defendant competent and reinstated proceedings.

Days before the scheduled preliminary examination in September 2018, defendant again moved to represent himself and for new counsel. Both motions were denied, with the court indicating its belief that defendant was using the *Marsden* and *Faretta* procedures as a means of delaying the

[2] Dr. Main's report, dated June 2018, noted that defendant had initially resisted accepting help from attorneys, but he appeared less paranoid during their interview than earlier reports suggested, and she believed he could understand the charges and the legal system in general, and had the ability to assist his attorney in his own defense.

Defendant refused to meet with Dr. Torry, despite multiple attempts by the deputy sheriffs to encourage defendant to leave his cell, so the doctor could not assess defendant's competency. Dr. Torry did state that defendant's refusal to meet and refusal to work with prior attorneys made him concerned about defendant's ability to cooperate with present counsel and to maintain proper courtroom conduct.

3

proceedings. The court held defendant to answer to the rape charge at the preliminary examination.

Throughout the remainder of his proceedings, defendant made numerous additional *Marsden* and *Faretta* motions. He also refused to attend court with enough regularity that the court issued an "extraction order" for the sheriff to bring him to court using all reasonable force.

**B. The second suspension of proceedings and competency trial**

At a hearing on November 13, 2018, the day before jury selection was set to begin, defense counsel expressed a doubt about defendant's competency. Defense counsel reported that defendant was being housed in a "safety cell," that he was "babbling" incoherently, and that Dr. Quezada, a psychiatrist, had expressed a doubt about defendant's competency. Defense counsel believed that defendant had "steadily degenerated and gotten worse." On November 14, 2018, the trial court found there was no substantial evidence of incompetency and concluded defendant was instead intentionally manipulating the court's processes to delay proceedings.

By November 26, 2018, defense counsel reiterated his doubt about defendant's competency and produced a report from psychiatrist Dr. Eugene Schoenfeld, who concluded defendant was incompetent to stand trial. Dr. Schoenfeld's report noted that defendant believed various people—the judge, his present lawyer and a prior lawyer, and one of his victims in another case—were in " 'cahoots' " with each other; that defendant disagreed with nearly everything his present counsel had done and threatened to hurt counsel; and that defendant has bipolar disorder, but refused medication.

The trial court suspended proceedings pursuant to section 1368. The court received evaluations from two doctors—Dr. Main and Dr. Torry—both opining defendant was incompetent. Dr. Main's report dated December 30,

4

2018 indicated that defendant refused medication to treat his psychosis, that he lacked insight into his condition, and that he believed his attorney is part of a " 'huge corrupt situation.' " Observing that defendant's "paranoia is pronounced, indicating symptoms identified with psychosis," Dr. Main opined that such paranoia rendered defendant incapable of participating in the court process and assisting his attorney. Dr. Main also noted that defendant's mental health impacted his ability to reason and to comply with courtroom decorum, and that medication would be necessary to reduce the severity of his psychotic thought process.

Dr. Torry's report dated December 27, 2018 indicated, among other things, that defendant had "various persecutory beliefs" about his attorney who he thought was "colluding with the prosecution." Dr. Torry opined that defendant likely has bipolar disorder with psychotic features or with a superimposed paranoid personality disorder, and that the symptoms of his mental illness—namely, his paranoid thought process, delusions, and disorganized thoughts—impair his understanding of the criminal proceedings and his ability to rationally assist counsel. Dr. Torry recommended that defendant take medication to help restore his competency and that he participate in didactic treatment to address his factual understanding of the nature of the proceedings.

Pursuant to the trial court's order, defendant was admitted to Napa State Hospital for competency treatment on June 5, 2019. On June 18, 2019—less than two weeks later—Napa State Hospital filed a certification of defendant's mental competency. Accompanying the certification was a clinical report authored by Napa State Hospital staff psychologist, Dr. Eric

Gonzalez,[3] indicating that defendant was competent but would "likely need to remain consistently compliant with psychotropic medications in order to maintain his current level of psychiatric stability." Defense counsel asked for a trial as to defendant's competency.

On August 23, 2019, the court held an evidentiary hearing concerning defendant's competency. The court admitted the certificate of competency and Dr. Gonzalez's accompanying report, and the aforementioned reports from late 2018 by Drs. Schoenfeld, Torry, and Main. The court also admitted Dr. Schoenfeld's stipulated testimony that defendant is currently incompetent as he refuses to meet with his attorney, but that defendant would be competent if he continued to take the medication prescribed at Napa State Hospital. A clinical psychologist from Napa State Hospital, Dr. Dominique Remaker, testified that defendant was found competent at a time when he was taking antipsychotic medication. Dr. Remaker said that according to Dr. Thomas—the unit psychiatrist at the state hospital— defendant would likely be incompetent if he stopped his medication.

Defendant testified. He indicated that since returning to jail, he discontinued taking the antipsychotic medication previously given to him at Napa State Hospital, stating: "Due to the recommendation of the jailhouse psychiatrist and the side effects that the medication gave me, yes, very much so. I do not take that medication at all." He agreed to meet with defense counsel if counsel "agree[d] to conduct himself like a professional." Defendant was able to articulate the roles of defense counsel and the trial judge in the proceedings, and he stated that he understood the charges against him.

---

[3] The report indicates it was administratively reviewed by Medical Director, Dr. Patricia Tyler, who was not then treating defendant.

The prosecutor argued that because there was a consensus in the reports that defendant would remain competent if he were medication compliant, the court should consider housing defendant at Napa State Hospital pursuant to section 1372, subdivision (e), where staff could enforce an order requiring defendant to take medication. In the alternative, the prosecutor asked the court to find defendant competent based on the reports and the court's own observations.

The court ultimately found defendant competent and reinstated proceedings, indicating the evidence showed that defendant understood the nature and purpose of the proceedings and could assist his attorney, though he chose not to do so for his own reasons. The court stated it observed defendant on the stand and defendant was "coherent, direct, on point, substantive, intelligent and, frankly, spot on in terms of who does what in the courtroom." The court declined to decide whether to order defendant housed in a facility other than county jail pursuant to section 1372, subdivision (e).

## C. The first trial and mistrial

The matter proceeded to trial in October 2019. On October 8, 2019, during the first attempt at jury selection, defendant acted out in front of the prospective jurors—e.g., he accused his attorney of being racist, yelled about wanting to represent himself, and lunged toward his attorney—resulting in the court dismissing the jury panel. Based on defendant's behavior, defense counsel renewed his request that the court find defendant incompetent, noting defendant could not control his behavior and arguing he was "manifestly" incompetent. The court declined to re-suspend proceedings. In the court's view, nothing suggested defendant was incompetent; rather, defendant simply did not want to proceed to trial and did not want to assist counsel.

A new panel of prospective jurors was brought in. But after some of the jurors may have seen defendant as he was being pushed in a wheelchair while barefoot, shackled, and wearing a gown, defendant cursed at the judge and his attorney in the courtroom. He threatened to kill the judge and violently rushed toward the bench despite being shackled with his hands to his waist and at his feet. Defense counsel renewed his request that the court find defendant incompetent citing defendant's past and present behavior. In declining the request, the court again perceived no information suggesting incompetence and reiterated that defendant appeared to be engaging in delay tactics or trying to get new counsel. Later during the same hearing, while discussing whether defendant could be placed in a holding cell with a speaker when trial began, defense counsel stated that he believed the trial should not proceed until defendant could get "continually medicated" and "participate in a rational manner."

After further discussion, including with the bailiffs who expressed safety concerns about bringing defendant to and keeping him in the holding cell, the bailiffs reported that defendant refused to come to court. The court elected to proceed with the trial, indicating defendant had voluntarily absented himself, then proceeded with instructions, opening statements, and receiving testimony. While defendant appeared at a subsequent trial date, the first trial ended in a mistrial after several jurors were dismissed or became unavailable.

## D. The Second Trial

Defendant's second trial took place in December 2019. Just before jury selection began, defense counsel told the court his interactions with defendant had been "incomprehensible," and he reasserted his belief that defendant was incompetent. Defense counsel explained: "I don't think he

understands the procedure. I think he understands what the accusations are, but I think, because of his mental condition, he is unable to manage himself within the procedure in a way that effectively assists his counsel in defense of this case." Defense counsel presented nothing further. The court responded that defendant had already been found competent, and expressed its belief that the record did not support re-suspending proceedings.

The prosecution's case against defendant included the testimony of the alleged rape victim Jane Doe, a videotape of defendant's pretrial police interview, and defendant's preliminary hearing testimony. The defense case, in the main, centered on defendant's testimony. Defendant testified on direct examination without questioning by his attorney and by way of a narrative. His narrative was interrupted by dozens of objections on grounds such as irrelevance and for being argumentative. After hearing the evidence, the jury found defendant guilty of rape. The trial court sentenced him to eight years in prison. Defendant appealed.

DISCUSSION

### A. Competency

Defendant contends the trial court erred in failing to hold a new competency hearing when his mental condition deteriorated after he returned from Napa State Hospital and stopped taking medication. He cites to *People v. Rodas* (2018) 6 Cal.5th 219 (*Rodas*) in support. Although both parties agree there was error, they dispute the applicable remedy. We discuss the error and remedy below.

*1. Failure to Hold New Competency Hearing*

"[D]ue process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial." (*Rodas*, *supra*, 6 Cal.5th at p. 230.) An individual is incompetent to stand trial "if, as a result

9

of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a); *People v. Wycoff* (2021) 12 Cal.5th 58, 81–82 (*Wycoff*).)

"[A]n accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense.' " (*Rodas, supra,* 6 Cal.5th at p. 231.) "[S]ubstantial evidence for this purpose is *evidence 'that raises a reasonable or bona fide doubt' as to competence,* and the duty to conduct a competency hearing 'may arise at any time prior to judgment.' " (*Ibid.,* italics added.) "The word 'substantial' does not mean that for a doubt to arise, there must be a large quantity of evidence of a defendant's incompetence; rather, it means that there must be some evidence of sufficient substance that it cannot be dismissed as being inherently unpersuasive." (*Wycoff, supra,* 12 Cal.5th at p. 83.) " ' "Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence . . . may be to the contrary." ' " (*Id.* at p. 82, italics omitted.) If such a doubt exists, "all criminal proceedings are to be suspended until the competence question has been determined." (*Rodas,* at p. 231.)

"As a general rule, once a defendant has been found competent to stand trial, a trial court may rely on that finding absent a substantial change of circumstances. But when a formerly incompetent defendant has been restored to competence solely or primarily through administration of medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish such a change in circumstances and will call for additional, formal investigation

before trial may proceed.  In the face of such evidence, a trial court's failure to suspend proceedings violates the constitutional guarantee of due process in criminal trials." (*Rodas*, *supra*, 6 Cal.5th at p. 223.)

In *Rodas*, the defendant was found incompetent and committed to the Department of State Hospitals.  (*Rodas*, *supra*, 6 Cal.5th at pp. 224–226.) When he was finally certified competent, medical staff indicated that his competency was dependent on continuation of his medication regime.  (*Id.* at p. 226.)  After jury selection and before opening statements, the defendant's attorney declared a doubt as to the defendant's competency.  (*Id.* at p. 227.) During a colloquy with the court, the defendant stated he had stopped taking his medication.  (*Id.* at pp. 228–229.)  The court did not suspend the proceedings and trial proceeded.  (*Id.* at p. 229.)  During trial, and against the advice of counsel, the defendant testified incomprehensibly.  (*Ibid.*)  The defendant was ultimately convicted of murder with special circumstances, and two counts of attempted murder.  (*Id.* at p. 230.)

The Supreme Court reversed, concluding the trial court erred in failing to suspend the proceedings after defense counsel expressed a doubt as to the defendant's competence.  (*Rodas*, *supra*, 6 Cal.5th at pp. 235–236.)  The *Rodas* court indicated that although the defendant had previously been found competent, the trial court had since become apprised of information that constituted substantial evidence of mental incompetence.  Specifically, the court knew the defendant had stopped taking his medication, defense counsel declared a doubt as to the defendant's competence, and counsel reported that the defendant's communications consisted of incoherent " 'word salad' " just as before when he was incompetent.  (*Id.* at pp. 232–233.)  Moreover, even if the foregoing were not enough to show substantially changed circumstances to trigger proceedings under section 1368, the "defendant's nonsensical and

11

irrelevant testimony during trial, together with counsel's earlier presentation, clearly did so." (*Id.* at p. 235, fn. 5.)

"The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal 'only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion.' [Citation.] When the court is presented with 'substantial evidence of present mental incompetence,' however, the defendant is 'entitled to a section 1368 hearing as a matter of right.' [Citation.] On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. [Citation.] . . . A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test." (*People v. Mickel* (2016) 2 Cal.5th 181, 195.) "In resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217; *People v. Ramos* (2004) 34 Cal.4th 494, 507 ["Substantial evidence of incompetence may arise from separate sources, including the defendant's own behavior."].)

In this case, in the time leading up to his Napa State Hospital commitment for incompetency and essentially from the start of the case, defendant repeatedly made *Marsden* and *Faretta* motions, and the record reflects that defendant was unable or unwilling to work with several of his attorneys in the rational conduct of a defense. Proceedings were suspended in April 2018 because defendant's fifth attorney declared a doubt about his competence. Then in late 2018 came the reports of Drs. Schoenfeld, Main and Torry, which reflected that defendant was mentally ill and unmedicated

12

and that his mental illness impacted his ability to work with counsel due to paranoid and persecutory beliefs about his attorney. Drs. Main and Torry indicated that defendant could be restored to competency if treated with medication.

When Napa State Hospital certified defendant as competent shortly after his admission, the accompanying report indicated that defendant was medicated as soon as he was admitted, and when he was evaluated the week after, he "presented significantly different." The report cautioned, however, that while defendant was "currently competent, *he will likely need to remain consistently compliant with psychotropic medications in order to maintain his current level of psychiatric stability through the criminal proceedings*." (Italics added.)

On June 28, 2019, when requesting an evidentiary hearing concerning competency, defense counsel stated his belief that defendant had feigned competency, that defendant's mental state prohibited him from cooperating with and effectively assisting counsel, and that defendant's competency appeared dependent on medication. On July 15, 2019, defense counsel again indicated that defendant persisted in refusing to talk with him; for his part, defendant asked for a "conflict of interest" hearing.[4]

At the evidentiary hearing concerning defendant's competency, Dr. Remaker testified that defendant was found competent at a time when he was taking antipsychotic medication and that if he were to stop it is possible he would become incompetent. The court admitted stipulated testimony from Dr. Schoenfeld that defendant would be competent if he continued to take

---

[4]    In response, the court held a *Marsden* hearing on July 19, 2019, and statements made at that hearing further support the conclusion we reach here.

13

medication prescribed at Napa State Hospital.  Defendant testified that since returning to the jail, he stopped taking the antipsychotic medication previously given to him at Napa State Hospital.  He also acknowledged refusing to meet with his attorney at least once, though he claimed counsel lied about him refusing to meet on another occasion.  Defendant testified that he did not trust counsel, that counsel had a reputation for "representing Caucasian males better," and that counsel had shown "a lot of misconduct" while representing defendant.  When asked when he had last agreed to meet with counsel, defendant could not recall.

It was against this background that the trial court found defendant competent and proceeded to trial.  Defendant's case went to trial twice.  At his first trial, defendant acted out in front of the prospective jurors—e.g., accusing his attorney of being racist, yelling, and lunging at his attorney.  After this incident, defense counsel renewed his request that defendant be found incompetent, observing that defendant's outburst indicated an inability to control himself and to cooperate with counsel.  The court denied the request.  Shortly thereafter, defendant had another outburst in court.  After cursing and threatening to kill the judge, defendant violently rushed to the bench despite his restraints.  Defense counsel renewed his request that the court find defendant incompetent, but the court again declined.[5]  Then, just as jury selection commenced in the second trial, defense counsel reasserted his belief that defendant was incompetent, saying his interactions with defendant had been "incomprehensible."  Moreover, during the second trial,

_____

[5]     There is no dispute between the parties that the incidents that took place during the first trial, prior to the mistrial, are relevant to the question of whether there was evidence that raised a reasonable doubt as to defendant's mental competence.  (*People v. Young, supra*, 34 Cal.4th at p. 1217.)

14

defendant took the stand against his attorney's advice and delivered a narrative that was largely difficult to follow, argumentative, and irrelevant.

Considering the record in this case, the trial court was apprised of facts that raised a reasonable doubt as to defendant's competency and ability to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a); *Rodas, supra*, 6 Cal.5th at p. 233.) The court heard from mental health experts who reported and testified that defendant's competence depended on his mental health and medication compliance; the court was then informed that defendant had stopped taking his medication since returning from Napa State Hospital. Additionally, defense counsel repeatedly declared a doubt as to defendant's competence after he returned from Napa State Hospital, and defendant was exhibiting the same behavior as when he was previously unmedicated and declared incompetent, e.g., he refused to meet with counsel, asked for new counsel, and expressed distrust of counsel. Moreover, the court witnessed defendant's physical and verbal aggression and his meandering narrative testimony during the second trial. On this record, the evidence of incompetence before the trial court was clearly substantial. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 465.) Accordingly, we agree with the parties that the court should have suspended proceedings and conducted the formal inquiry under section 1368.

### 2. Remedy

We now turn to decide the appropriate remedy, which is disputed. Relying on *Rodas, supra*, 6 Cal.5th 219, defendant contends the correct remedy is a reversal and a new trial. Conversely, the People rely on *People v. Ary* (2004) 118 Cal.App.4th 1016 (*Ary*) in urging that we not reverse the judgment but instead remand to the trial court for a determination "whether a retrospective competency hearing is feasible."

In addressing this topic, *Rodas* indicates that historically the remedy for error such as occurred here has been automatic reversal. (*Rodas*, *supra*, 6 Cal.5th at pp. 238–239.) But as *Rodas* essentially observed (*id*. at pp. 238–239), cases such as the *Ary* decision left open the possibility that in the rare case a meaningful retrospective competency determination might be possible (*Ary*, *supra*, 188 Cal.App.4th at p. 1028). *Ary* had involved a defendant with an intellectual disability,[6] and the *Ary* court opted to remand to the trial court to determine whether a retrospective hearing was feasible because the record contained "extensive expert testimony and evidence . . . regarding defendant's [intellectual disability] and his ability to function in the legal arena" at the time of his disputed competency. (*Ary*, at p. 1029.)

Although *Rodas* assumed, for purposes of argument, that a retrospective competency hearing might be proper in some cases, the court concluded such a hearing would not be appropriate in the case before it. (*Rodas*, *supra*, 6 Cal.5th at p. 239.) In the court's words, "[T]he critical question in determining whether a retrospective competency hearing is feasible is whether there is 'sufficient evidence to *reliably* determine the defendant's mental competence when tried earlier.' [Citation.] The burden of proof in a retrospective hearing is on the defendant, and feasibility requires finding that such a hearing 'will provide defendant a *fair opportunity* to prove incompetence, not merely [that] some evidence exists by which the trier of fact might reach a decision on the subject.' [Citation.] [¶] Several factors might bear on this inquiry. [Citation.] Here, however, the dominant considerations are the fluctuating nature of defendant's symptoms, the

---

[6] The term "intellectual disability" has replaced the term "mental retardation" in other cases and so we employ that terminology here. (*People v. Boyce* (2014) 59 Cal.4th 672, 717, fn. 24.)

16

passage of time, and the lack of contemporaneous expert evaluations. To saddle defendant with the burden of proving his incompetence in March 2014, around five years after the fact, without the benefit of any contemporaneous psychiatric, psychological, or neurological evaluation, would neither be fair nor produce a reliable result. *Without any significant prospect of evidence showing competence being produced, moreover, a retrospective hearing could not feasibly cure the . . . error.*" (*Id.* at pp. 239–240, some italics added.)

Like the *Rodas* court, we conclude the case before us is unsuitable for a retrospective competency hearing. Defendant here has a mental disorder—bipolar disorder—which is not an intellectual disability, and the record contains reports and testimony from various doctors and defense counsel indicating that defendant's symptoms and competency appeared in a state of flux. The most recent evaluation of defendant's mental condition occurred nearly three years ago in June 2019, when defendant was medicated to competency at Napa State Hospital. Prior to that, he was evaluated by Drs. Main, Torry, and Schoenfeld in November and December 2018, roughly a year before his second trial. There is no indication defendant was ever re-evaluated after the competency issue reemerged two weeks after his release from Napa State Hospital in June 2019.

Given the fluctuating nature of defendant's symptoms, the lack of a contemporaneous expert evaluation regarding defendant's mental condition at the time of his second trial, and the considerable passage of time since that trial, we conclude a retrospective hearing would not be an appropriate remedy in this case. (*Rodas*, *supra*, 6 Cal.5th at p. 241 [no reliable contemporaneous evidence of the defendant's mental condition at trial where the defendant was certified competent in May 2013 after being committed for

17

about a year, and his trial began in March 2014]; *People v. Easter* (2019) 34 Cal.App.5th 226, 249 [remand for a retrospective competency hearing not an appropriate remedy where expert evaluations were performed 13 months before defense raised doubt as to competency].) We therefore reverse the judgment of conviction. Defendant may be retried on the charge for which he was convicted if he is not presently incompetent to stand trial. (*Rodas*, at pp. 241–242.)

## B. Remaining Issues

Defendant raises additional arguments on appeal. He contends that the trial court erred in failing to grant his motion to dismiss on *Trombetta/Youngblood* grounds; in admitting his pretrial police interview because he was not properly advised under *Miranda*; and in excluding a proffered defense expert. He also contends that cumulative prejudice warrants reversal. In a supplemental brief, defendant further contends that he is entitled to resentencing due to recent amendments to section 1170. Because we have concluded a reversal is warranted, these issues are moot and need not be addressed. Nevertheless, because the remedy that defendant seeks for the alleged erroneous denial of his *Trombetta/Youngblood* motion is dismissal of the case, we will address that single issue.

### 1. *Trombetta/Youngblood motion: additional background*

During the investigation of the case, the police had information that defendant and Jane Doe exchanged messages on a social media application called "Snapchat." After defense attempts to obtain records from Snapchat proved unsuccessful, the defense filed a motion seeking to compel the prosecution to subpoena records from Snapchat. Ultimately the prosecution agreed to serve a search warrant on Snapchat. Inspector Amy Yardley, working for the district attorney's office, authored the warrant affidavit

18

seeking Snapchat communications between defendant and Jane Doe from July 18, 2017 to August 23, 2017; the warrant was signed and served on November 6, 2017. When she wrote the warrant affidavit, Yardley was unaware that Jane Doe had corrected the date of the alleged rape to July 13, 2017. At a later hearing, the prosecutor indicated it had obtained records from Snapchat but they contained nothing between defendant and Jane Doe.

At some point, Inspector Yardley learned Jane Doe corrected the date of the incident. Yardley, however, did not attempt to obtain another warrant for Snapchat data specifically from July 13 to July 18, 2017, because when Snapchat had responded to the warrant, it provided all the saved messages in Jane Doe's account dating back to 2016. That is, the warrant had already produced any saved records in Jane Doe's account, and no saved messages between Jane Doe and defendant were produced.

Defendant filed a *Trombetta*/*Youngblood* motion to dismiss, arguing that the prosecution failed to obtain alleged Snapchat messages between himself and Jane Doe, as well as surveillance footage from businesses located on the path from where Jane Doe worked to where the rape occurred. Following an evidentiary hearing, the trial court denied the motion. The court first noted the Snapchat messages and the surveillance footage were identified as being in the possession of third parties. The court found it speculative as to whether such records or footage ever existed at the time Jane Doe reported the crime. In any case, the court held, any perceived exculpatory value of such Snapchat evidence was speculative, and there was no showing of bad faith on the part of the police or prosecution. The court also determined that there was no evidence of any surveillance video that contained anything material to the case, and again there was no evidence of bad faith.

19

*2. Analysis*

*Trombetta* and *Youngblood* concern " 'what might loosely be called the area of constitutionally guaranteed access to evidence.' " (*Trombetta, supra,* 467 U.S. at p. 485; *Youngblood, supra,* 488 U.S. at pp. 55, 57–58.) *Trombetta,* which involved the failure to preserve breath samples from defendants after breath analyses indicated they had been driving with blood alcohol levels above the legal limit, held that due process requires the state to preserve evidence that "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta,* at pp. 482, 488–489 [rejecting due process challenge to California's policy of not preserving breath samples obtained by the police].) *Youngblood* concerned the state's failure to preserve "potentially useful evidence," i.e., evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Youngblood,* at pp. 57–58.) *Youngblood,* which involved evidence that could not be rigorously tested because it had been improperly stored, held that the failure to preserve potentially useful evidence is not a denial of due process "unless a criminal defendant can show bad faith on the part of the police." (*Id.* at pp. 53, 58.) We review a ruling denying a *Trombetta*/*Youngblood* motion to dismiss for substantial evidence. (*People v. Montes* (2014) 58 Cal.4th 809, 837 (*Montes*).)

In this case, defendant complains that the police and prosecution failed to *request and obtain* surveillance videos and Snapchat records after Jane Doe changed her report of when the rape occurred. But it is undisputed that any such evidence was never actually in the possession of the police or the prosecution. This circumstance is significant because *Youngblood* and

20

*Trombetta* were cases in which lost or destroyed evidence had been in the state's possession. (See *People v. Alexander* (2010) 49 Cal.4th 846, 878 ["Due process requires the state preserve evidence *in its possession* where it is reasonable to expect the evidence would play a significant role in the defense." (italics added)].) As the California Supreme Court has noted, "[i]t is not entirely clear that the failure to obtain evidence falls within ' "what might loosely be called the area of constitutionally guaranteed access to evidence." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 943.) Thus, while the Supreme Court "has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against the prosecution at trial," the court continues "to recognize that, as a general matter, due process does not require the police to collect particular items of evidence." (*Ibid*.; *Montes*, *supra*, 58 Cal.4th at pp. 837–838.)

Defendant attempts to circumvent this problem by arguing, at least with regard to the alleged Snapchat evidence, that the prosecution had "constructive possession" of such evidence once it served the warrant on Snapchat. At that point, defendant argues, the prosecution had the legal right to obtain and control that data and the warrant allegedly caused Snapchat to destroy relevant records because it asked for data beginning on July 18, 2017, which postdated the alleged rape on July 13. But the evidence in the record supports the conclusion that Snapchat disposed of its records according to its own retention policy, and there is nothing to suggest the prosecution's warrant "caused" Snapchat to delete data.

Contrary to defendant's assertion, *People v. Alvarez* (2014) 229 Cal.App.4th 761 (*Alvarez*) does not support his theory of constructive possession. In *Alvarez,* the court found a *Youngblood* violation where the police lost videos from cameras *that were maintained and controlled by the*

21

*police department and accessible to the police at all times*. (*Alvarez*, at pp. 764, 767.) Although defendant is correct that *Alvarez* briefly mentions the existence of private camera footage sought by defense counsel, the opinion makes clear that its finding of a *Trombetta* violation was based on the loss of footage from the police-controlled cameras. (*Alvarez,* at pp. 764, 766–771, 774–777.)

Defendant also claims that the prosecution acquired the legal duty to exercise due care to obtain the Snapchat records for the correct dates when it voluntarily served a search warrant on Snapchat, and that the prosecution's breach of this duty "proximately caused or was a substantial factor in proximately causing" destruction of the records. But it is unclear why framing this claim as one about duty, breach, and proximate causation— concepts typically associated with claims of negligence—would bring this case within the reach of *Trombetta* or *Youngblood* despite the circumstance that the police and prosecution never actually possessed the evidence at issue. Defendant cites no authority supporting this notion.

Nor is this an appropriate case for addressing whether or to what extent *Trombetta* and *Youngblood* should be extended to a failure to collect evidence. Here, the record contains no evidence indicating that the alleged missing evidence had apparent exculpatory value or that the police acted in bad faith. Indeed, defendant makes no showing that any of the alleged missing evidence existed at the time Jane Doe reported the crime.

In sum, the record before us fails to establish that the trial court erred in denying defendant's *Trombetta*/*Youngblood* motion.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

22

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Petrou, J.


A159741